Argued and submitted November 13, 1985, affirmed June 11, 1986

STATE OF OREGON,
*Respondent,*

*v.*

BRIAN DONALD CHRISTEN,
*Appellant.*

(10-84-02598; A35401 Control)

STATE OF OREGON,
*Respondent,*

*v.*

CECIL TRAVIS HANKINS,
*Appellant.*

(10-84-02600; CA A35412)
(Cases Consolidated)

720 P2d 1303

Harold R. Daughters, Eugene, argued the cause for appellants. With him on the brief was Stephen L. Behrends, Eugene.

Terry Ann Leggert, Assistant Attorney General, Salem, argued the cause for respondent. With her on the brief were Dave Frohnmayer, Attorney General, and James E. Mountain, Jr., Solicitor General, Salem.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

WARREN, J.

## WARREN, J.

Defendants were convicted in a consolidated trial of unlawful manufacture and possession of a controlled substance in violation of ORS 475.992. They filed motions to suppress evidence seized pursuant to a search warrant and motions to controvert the affidavit made in support of the warrant. The trial court denied the motions to suppress and, with minor exceptions, denied the motions to controvert. In a consolidated appeal, defendants contest the denial of these motions.

The principal issue in this case is whether the affidavit contained sufficient information from which a magistrate could properly determine that there was probable cause to believe that evidence of criminal activity would be found on the premises searched. It is necessary to reproduce a substantial portion of Officer Smith's affidavit.

"[1] On February 16, 1984, Springfield Police Officer Randy Cook contacted me and advised me that a person he considered a confidential and reliable source of information about controlled substance trafficing [sic] had advised him that there was a large growing opertion [sic] down in the Cottage Grove area, concentrating on the growing of the controlled substance marijuana. The exact description of the place and persons was not known. Officer Cook has advised me that this confidential citizen has proven his reliability on numerous occasions by providing information which has led to the aquisition [sic] of search warrants relating to controlled substance transactions and that the controlled substances have in fact been located as a result of the information provided by the citizen.

"[2] On March 6, 1984, I contacted a person I consider to be a confidential and reliable informant relating to controlled substances trafficing [sic] who has, on numerous previous occasions, provided me with accurate and truthful information which has led to the discovery of controlled substances and in one instance the arrest and prosecution of a suspect in a burglary. My experience has been that the information this confidential citizen has related in each instance [has] been accurate and truthful. On numerous occasions I have been able to independently corroborate the information provided by this confidential reliable citizen.

"[3] On March 6, 1984, I had occasion to talk with this confidential reliable citizen and at that time, in response to

my questioning, the citizen advised me that if I was interested in a large marijuana growing operation I should look at the Old Diston School located at 39881 Brice Creek Road, Culp Creek, Lane County, Oregon. More specifically, the confidential reliable citizen informed me that I should be looking at the gymnasium of the Old Diston School, described immediately above.

"[4] On March 15, 1984, I personally contacted an official at the Lane Rural Electric Co-op, which provides electric power to the area surrounding the Old Diston School. At that time I was informed by Jerry Pruitt of Lane Rural Electric Co-op that power to the Old Diston School, described above, was billed to Old School Wood Products, and to Cecil Hankins at the above-described Old Diston School address. An additional separate subscriber at the same address was listed as Robert Solonche. Mr. Pruitt indicated that the bills to both subscribers at that address were customarily mailed to the Old Diston School address. The kilowatt usage billed to Mr. Hankins for the time period January of 1983 through March of 1984 were as follows: January, 1983, 5,520 kilowatts - $195.23; February, 1983 - 7,440 kilowatts - $260.70; March, 1983 - 7,620 kilowatts - $266.84; April, 1983 - 8,820 kilowatts - $307.76; May, 1983 - 7,080 kilowatts - $248.43; June, 1983 - 8520 kilowatts - $297.53; July, 1983 - 8,220 kilowatts - $325.94; August, 1983 - 7,140 kilowatts - $285.03; September, 1983 - 6,900 kilowatts - $273.72; October, 1983 - 6,660 kilowatts - $265.41; November, 1983 - 5340 kilowatts - $214.19; December, 1983 - 5,820 kilowatts - $232.82; January, 1984 - 7,560 kilowatts - $300.33; February, 1984 - 7,740 kilowatts - $307.3l; March, 1984 - 6,420 kilowatts - $256.00. The power usage and billing amounts of Robert D. Solonche were as follows: June, 1983 - 825 kilowatts - $42.13, July, 1983 - 2,381 kilowatts - $99.38; August, 1983 - 3,40l kilowatts - $138.96; September, 1983 - 3,430 kilowatts - $140.08; October, 1983 - 3,418 kilowatts - $139.62; November, 1983 - 4,715 kilowatts - $190.94; December, 1983 - 3,623 kilowatts - $147.57; January, 1984 - 4,154 kilowatts - $168.18; February, 1984 - 1,307 kilowatts - $57.00; March, 1984 - 3,206 kilowatts - $131.00. *These amounts of power usage are considerably more than normal residential usage.*

"[5] That both myself and Officer Randy Cook of the Springfield Police Department have made attempts to locate any registered or corporate or assumed business name for Old School Wood Products and have learned that no such business is listed with the Corporations Commissioner, there is no

listing in the telephone book, and though there is a telephone at the Old Diston School, it is an unlisted number.

"[6] That on March 28, 1984, in an undercover capacity, I accompanied an employee of Cal Gas Company to the above-described Old Diston School regarding the installation of a water heater and gas range. That while present at and around the Old Diston School as described above, I observed no signs of advertising of any kind indicating a business name of Old School Wood Products or anything of the like. I further noticed that the gymnasium portion of the Old Diston School had the windows covered so that the interior of the gymnasium could not be observed. I also noticed a large exhaust fan at the top of the building that periodically turned on and off while I was present. While assisting the Cal Gas employee, I had occasion to talk with two persons present in and around the west end of the school building which is attached to the gymnasium. These persons identified themselves as Cecil Hankins and 'Brian'. Upon completion of the Cal Gas work, Cecil Hankins paid the Cal Gas official with six very crisp new-appearing one hundred dollar bills. During my previous conversation with Mr. Hankins on March 28, 1984, Hankins advised me that there really wasn't any work up in the area and he only worked occasionally.

"[7] Prior to my assisting the Cal Gas employee on March 28, 1984, another Cal Gas employee advised me that on the previous Friday, employees of Cal Gas had been to the Old Diston School described above, for the purpose of laying the gas line for the installation of the hot water heater and the gas range. That in connection with that work, they had *observed a large loam pile* located approximately 20 yards from the southwest corner of the school. After the line was dug for the gas pipeline, they used some of the loam to cover the pipeline and when doing so, discovered that *underneath the loam, was a large pile of potting soil.* That I know from my previous experience and training as a police officer in the field of controlled substance investigations, that *loam and potting soil are commonly needed and used in the manufacture and growing of marijuana.* The said Cal Gas employees also advised me that on the same and previous Friday, when digging the line for the gas range and water heater, they had also observed several tall extension sprinklers leaning up outside the school building and a very considerable amount of garden hose. I also know from my investigation and training and experience as a police officer engaged in narcotics investigations that hose and sprinklers are *necessary* ingredients in the successful growing of marijuana indoors. While myself and

the Cal Gas employee were present on March 28, 1984, at the Old Diston School described above, I also observed what appeared to be the new installation of drainage lines outside of the southwest corner of the gymnasium and extending back toward the general direction of the southwest corner and the western side of the gymnasium. 'Brian' and Hankins even commented on the fact that they had excellent drainage now. I know from my experience and training as a narcotics investigator that a large indoor marijuana growing operation would result in the drainage of a considerable amount of water with the need for handling of drainage of the water. When I accompanied the Cal Gas employee to the Old Diston School on March 28, 1984, the sprinklers and the *loam pile and the potting soil pile previously described to me were not present or observable in the area.* At no time could I see into the gymnasium portion of the school building. That also based on my training and experience in narcotics investigations, I am aware that for the successful growing of marijuana indoors, that large growing lights and power source are necessary because of the inability to access sunlight. That the amounts of power usage are consistent with the use of a large quantity of power at a considerable per month dollar amount. This is particularly suspicious in this instance as the residence portion at the western end of the building, from my personal observation, was heated by wood stove.

"[8] I also know from my past experience and training in narcotics investigations that large vent fans, similar to the ones [*sic*] seen on the top of the Old Diston School building on March 28, 1984, serve the function of regulating the temperature, and to some extent, the moisture content of buildings. This also would be consistent with the need to regulate the temperature and moisture content of the air inside the enclosed gymnasium for marijuana growing purposes." (Emphasis supplied.)

We first consider defendants' motions to controvert the affidavit. The trial court struck two small portions of the affidavit, and defendants argue that additional portions should be stricken. First, they claim that the reference in paragraph [7] to the use of sprinklers as *necessary* to indoor marijuana growing is controverted by Smith's testimony. The trial court agreed and struck the word necessary. The trial court concluded that the remaining part of the amended sentence in paragraph [7] is accurate.

Second, they contest the comparison in paragraph [4]

of electricity consumption with "normal residential usage," arguing that Smith "knew the school building wasn't purported to be a residence." Defendants refer to the fact that most of the electricity used at that address was billed to Old School Wood Products. The affidavit indicates that there was no evidence other than the electricity bill to indicate that a wood products business was being conducted at the address.[1] The affidavit also states that there was a residence at the western end of the building, which was heated by a wood stove (paragraph [7]). We think the comparison of electricity consumption with normal residential usage is not misleading and is helpful to a determination of probable cause. It indicates that electricity far in excess of that normally used for residential purposes was being consumed on the premises, which was not accounted for by any objective evidence of a legal enterprise.

■ Finally, defendants contend that all references in paragraph [7] to a pile of soil and loam and their use in the manufacture of marijuana should be excised in light of testimony by Cal Gas employes that they concluded that the soil was used to construct an outdoor race track for remote-controlled miniature cars. They reached that conclusion from observing defendants' shaping the soil with rakes and from defendants' discussing their enthusiasm for the sport. The affidavit accurately states that Smith was told that there was a large pile of potting soil outside the building which was not present when he visited the premises. The Cal Gas employes' conclusions about the use of the soil for a race track are not binding on the magistrate nor are they the only reasonable inference from the testimony as to the possible uses of the soil. The trial court did not err in refusing to excise these statements.

Defendants argue that the trial court erred in denying their motions to suppress evidence seized during the search, claiming that the warrant was not based on probable cause. They contend that the information provided by informants—described in paragraphs [1], [2] and [3]—cannot be

---

[1] Defendants offered in evidence a photograph of a mailbox marked "Old School Wood Prod." The officer testified that he had never observed that name on a mailbox at the premises searched; he therefore had no cause to put that information in the affidavit.

considered because the affidavit does not comply with former ORS 133.545(3)[2] and that the balance of the information does not constitute probable cause.

Former ORS 133.545(3) provided:

"The application shall consist of a proposed warrant in conformance with ORS 133.565, and shall be supported by one or more affidavits particularly setting forth the facts and circumstances tending to show that such things are in the places, or in the possession of the individuals, to be searched. *If an affidavit is based in whole or in part on hearsay, the affiant shall set forth facts bearing on any unnamed informant's reliability and shall disclose, as far as possible, the means by which the information was obtained.*" (Emphasis supplied.)

*State v. Russell,* 293 Or 469, 473, 650 P2d 79 (1982), holds that *former* ORS 133.545(3) is to be interpreted consistently with existing—as of 1973, the time of its enactment—and foreseeable decisions of the United States Supreme Court applying the Fourth Amendment. Article I, § 9, of the Oregon Constitution is similarly construed. *State v. Souders,* 74 Or App 123, 128, 700 P2d 1050, *rev den* 300 Or 112 (1985). We have held that the statute and the state constitution are to be interpreted consistently with *Aguilar v. Texas,* 378 US 108, 84 S Ct 1509, 12 L Ed 2d 723 (1964), and *Spinelli v. United States,* 393 US 410, 89 S Ct 584, 21 L Ed 2d 637 (1969), and *not* according to the less restrictive *Illinois v. Gates,* 462 US 213, 103 S Ct 2317, 76 L Ed 2d 527 (1983). *State v. Horwedel,* 66 Or App 400, 402-03, 674 P2d 623, *rev den* 296 Or 638 (1984).[3]

*Aguilar,* held that, when a search warrant is issued based *solely* upon information supplied by an informant, the affidavit must contain information bearing upon the reliability of the informant and the basis of his knowledge.[4] *Spinelli* held that an informant's detailed description of the criminal

---

[2] *Former* ORS 133.545(3) has been slightly modified, in a way not pertinent to this decision, and renumbered ORS 133.545(4).

[3] We analyze the probable cause issue under Article I, § 9, and assume that, if the warrant is valid under that provision, it is also valid under the *less* restrictive "totality of the circumstances" analysis of *Illinois v. Gates, supra.*

[4] The opinion indicates that "[i]f the facts and results of * * * a surveillance had been appropriately presented to the magistrate, this would, of course, present an entirely different case." 378 US at 110 n 1.

activity may in some circumstances permit an inference of the basis of the informant's knowledge and may thereby satisfy *Aguilar. Spinelli* also indicates that an informant's tip which alone does not satisfy *Aguilar* may be considered by a judge along with other corroborative information obtained by police investigation to establish probable cause. 393 US at 418.

 Defendants claim that the affidavit contains no information bearing on the informants' reliability or the basis of their knowledge. We think that the affidavit sufficiently sets forth information bearing on the informants' credibility and reliability, because it recites the officers' successful experiences in relying on their tips. Defendants are correct in that the affidavit does not set forth the means by which the informants gained their knowledge, which *former* ORS 133.545(3) required the affiant to disclose "as far as possible."[5] That does not mean that their tips cannot be used in determining probable cause. *Former* ORS 133.545(3) did not absolutely require that the basis of the informant's knowledge be set forth. The basis of knowledge requirement of that statute may be satisfied by direct evidence as to the basis of the informant's knowledge; also, under *Spinelli,* if the informant provides a sufficiently detailed description, the magistrate may infer that the informant had first-hand information. In addition, *Spinelli* holds that information obtained by a police investigation which corroborates an informant's tip may be considered along with the tip to establish probable cause, even if the affidavit does not affirmatively set forth the basis of the informant's knowledge.

██ ██ The information gleaned from the officer's investigation—the extraordinarily high electric bills; payment in six crisp new one-hundred-dollar bills when defendant indicated that he worked only occasionally; the hoses, drain, sprinklers, soil and exhaust fan which turned on intermittently; defendants' comment that they now had excellent drainage; the covered windows of the gymnasium and the lack of evidence of

---

[5] The police report of Smith's contact with the second informant stated that the informant "would not give any other information regarding the operation" than its location. The state claims that the affidavit satisfied *former* ORS 133.545(3), because the officer put in as much as he knew about the basis of the informant's knowledge, that is, nothing at all. We think the statute contemplates some effort on the affiant's part to determine the means by which the informants gathered their knowledge and that the statute cannot be satisfied as simply as the state claims.

a wood products business—were highly suspicious for a trained officer as indicating the presence of an illegal marijuana-growing operation. The observations were also consistent with lawful activity and do not, by themselves, constitute probable cause. Considered together with the informants' tips, the second of which was detailed as to the location of the activity, we think that there was probable cause to believe evidence of crime would be found on the premises.

1 LaFave, *Search and Seizure,* § 3.3, 566-67 (1978), indicates that it is proper in these circumstances to consider the informant's tip as contributing to probable cause:

> "More difficult is the case in which it cannot quite be said that 'probable cause is established without necessary resort to the hearsay,' but where this other information standing alone is nonetheless highly suspicious. May it be said in such a case that the informant's story, albeit lacking a showing of the basis of knowledge, may be taken into account for the purpose of supplying the 'little bit more' which is needed to elevate this other information up to the level of probable cause? The answer is yes. As stated in Spinelli v. United States, [*supra,* 393 US at 418,] though there 'the informant's tip—even when corroborated to the extent indicated—was not sufficient to provide the basis for a finding of probable cause,' it does not follow 'that the tip was so insubstantial that it could not properly have counted in the magistrate's determination. * * * ' "

Although the informants' tips standing alone would not establish probable cause, because the affidavit failed to disclose the basis of their knowledge, that information combined with the officers' observations of suspicious activity provided a sufficient basis from which the magistrate could find probable cause to believe that there was evidence of criminal activity on the premises searched. The trial court did not err in denying defendants' motions.

Affirmed.