Argued and submitted September 4, affirmed December 9, 1987, reconsideration denied February 12, petition for review denied March 1, 1988 (305 Or 274)

## STATE OF OREGON,
*Respondent,*

*v.*

## JAY SCOTT HOWE,
*Appellant.*

### (CR86-4-73; CA A42026)

746 P2d 746

Nick Nylander, North Bend, argued the cause and filed the brief for appellant.

Christine Chute, Assistant Attorney General, Salem, argued the cause for respondent. With her on the brief were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

ROSSMAN, J.

Warren, J., dissenting.

## ROSSMAN, J.

Defendant was convicted of unlawful manufacture of a controlled substance in violation of ORS 475.992. He moved to suppress evidence seized pursuant to a search warrant and also to controvert the affidavit made in support of the warrant. The trial court denied both motions, and defendant appeals. The primary issue is whether the affidavit contained sufficient facts from which a magistrate could properly determine that there was probable cause to believe that evidence of criminal activity would be found at defendant's residence. We find the affidavit sufficient and affirm.[1]

---

[1] Relevant portions of the oral affidavit state:

"'The whole thing started on March, er, May 10th, 1985, when Deputy Sheriff Randy Probasco advised me personally of the following. That the Brookings Police received a theft complaint from Brookside Florist as follows. A suspect driving a Toyota pickup bearing Oregon license KUH 159 just left the florist shop with 20 sacks of potting soil, one and one-half cubic feet each, and 300 pots without paying for the material. Probasco stopped the vehicle with the Brookings Police in Brookings. The only person in the vehicle was the registered owner of that vehicle, Jay Scott Howe, of 33050 Hillside Acres Road. Howe advised officers he simply forgot to pay for the purchase and he was allowed to return to the florist shop and no criminal complaint was pursued. Howe did tell Probasco that he was going into the tomato business. And Probasco further advised that Howe was noted to be extremely nervous during his police contact.

"Since being notified of Howe's intention in 1985 of becoming a tomato farmer I personally have periodically patrolled by Howe's residence at Hillside Acres Road and noted the following.

"From May 1985 to the present date I have never seen a tomato plant on Howe's property. There have never been any pots or containers commonly used for potting plants observed on Howe's property. There is no apparent landscaping or any attempt to maintain a yard or a flower garden or a vegetable garden on this property. And there has never been any evidence of a tomato business being operated on the property.

"I recently contacted some of the neighbors around the hillside acres road and learned that Jay Howe and the man he was living with at the time excavated under the east portion of the residence during the winter of 1984, and a cinder block basement was constructed to create a full basement. The subject was later identified by myself as Gregory Dennis Pederson, date of birth 4-15-49, that lived with Jay Howe for several months and helped Howe construct that basement I just spoke of. After talking with the neighbors they refused to be named in any official proceedings but were glad to cooperate as far as giving any information. So I did a computer check of Gregory Pederson and it revealed that he was on probation and apparently still is to the State Corrections Division in Tillamook for driving under the influence. On February 19th of this year I contacted Pederson's Probation Officer, a Miss Jane Workman at the Tillamook branch. Workman sent me a photograph of Pederson and told me to contact Sgt. Tom Groat of the Lincoln City Police Department. On the 24th of February I did contact Sgt. Groat by phone, and Groat advised me of the following. He was very familiar with Greg Pederson and that Groat personally investigated an indoor marijuana grow opera-

Defendant contends that (1) the affidavit contained insufficient facts to support probable cause for issuance of a warrant and (2) the trial court erred in considering so-called

tion about two years ago that Pederson was involved in. There was two arrests made in the investigation; however Pederson was not arrested or charged. Groat advised that there was clear evidence connecting Pederson to the operation that netted 38 plants and grow light equipment. Sgt. Groat further said that Pederson is well known by the law enforcement community in Lincoln City area as a drug abuser. Greg Pederson's computerized criminal history also reflects an also-known-as name of Jay Scott Howe, date of birth 1-20 of 50, and his computerized criminal history reflects an arrest by the State Police in Tillamook on September 2nd of 1985 for driving under the influence in which Pederson at that time used Jay Scott Howe's name and date of birth.

"I checked the assessor's records at the Curry County Courthouse and on account number 35 14 31 BD, tax lot 2200, and found that the floor plan records indicate a partial basement, a daylight type, under the west portion of the residence at 33050 Hillside Acres, and there was no record of a basement constructed under the east portion of the residence.

"Random checks by police officers from February 28th of this year to the present date indicate that that two obvious details as follows. First, that a subject that owns a new silver Toyota pickup lives with Jay Scott Howe at 33050 Hillside Acres, and the owner of that silver pickup is identified as Keith Allen Mans with a date of birth of 1-18-56. Further, a computer check of Keith Mans' criminal history shows an Oregon state identification number of OR5951343 which reflect an arrest in November of 1981 by the Josephine County Sheriff's Office for manufacturing a controlled substance, over one ounce of marijuana. Secondly, that Howe and Mans rarely ever have visitor's [sic] at 33050 Hillside Acres.

"On April 8th of this year, John Welsh, a Curry County Deputy Sheriff advised me that he observed the following at 33050 Hillside Acres on the 6th of April of 86. Keith Mans' silver pickup was backed into the basement area. The pickup had several, Deputy Welsh described it as one row above the bed line, white plastic sacks with red lettering. The sacks appeared to be about 40 to 50 pounds in size and they appeared to Deputy Welsh to either be potting soil or steer manure. Welsh further said that this was the first time that he had ever seen the pickup backed into the parking area and that generally that it is was parked facing the residence, and that Welsh checked the pickup the following morning and that it was parked in the same place and the white bags were gone.

"During periodic checks of 33050 Hillside Acres over the past year I personally have noticed that a wood burning heater had been utilized from time to time. I've often noticed smoke coming from a chimney in the roof of the residence during the colder periods.

"I contacted Coos-Curry Electric Company this afternoon and learned the following. Jay Howe is provided the electric service as 33050 Hillside Acres starting on December 23rd, of 1982. Jay Howe, at that address, was assigned account number 7-188-050, and further that a hot water tank was wrapped with an insulating blanket in 1983 through a Coos-Curry energy conservation program and the power consumption at that address since March of 1982 is reflected on a sheet that the District Attorney has as a piece of evidence I believe.

"* * * * *

"The previous owner, which is reflected on the 1982 roll showed a power usage from...ranges from...of 1000, 1900 down to 480 kilowatt hours, and there's one unexplained high usage in April of 3490.

"corrected" evidence at the hearing on the motion to controvert.

We first address the issue raised by defendant's

---

"[DISTRICT ATTORNEY]: Now...are you...have you checked to familiarize yourself with what say like a family of your size...what, you and your wife and two children.

"* * * * *

"METCALF: The normal usage in my three bedroom home, with my family, is between 600 and 1000 kilowatt hours per 30 day period.

"[DISTRICT ATTORNEY]: Okay, and what range is Mr. Howe running there for the last couple years?

"METCALF: Generally from the high 2800 to, clear up to 4000 kilowatt hours per month.

"* * * * *

"Okay, I did a check on the...of the marijuana growers guide, authored by Mel Frank and Ed Rosenthal, page 114, and that revealed that indoor marijuana growers should set automatic timers to allow marijuana plants between 16 and 18 hours of artificial light per day. Based on my experience and training the following information is known. First that the marijuana growers guide is the most common reference guide used by marijuana growers. Most commercial indoor marijuana growing operations utilize 1000 watt metal hallide grow lights. Coos Curry Electric officials advised me that the 1000 watt lights will consume 1 kilowatt hour per hour while in use. An indoor grow operation utilizing 4 1000 watt lights 17 hours per day would consume 2040 kilowatt hours in a 30 day period. Based on the previous information submitted including the energy conservation measures...wrapped hot water tank and installation and utilization of wood heat in the residence and previous tenants power usage, records which reflect an increase of usage by Jay Howe of between 1500 and 2500 kilowatt hours per month for the same residence, and information from neighbors, police officers, tax records, florist shop, I believe that Jay Howe's residence is being utilized to cultivate marijuana. Jay Howe fits an obvious profile for an indoor marijuana cultivator based on the following. He has no or rarely any visitors at the residence. He associates with known and suspected marijuana cultivators. He has an enclosed room with no windows suitable for production of marijuana. He possessed materials commonly used for indoor marijuana operations, including the 300 pots, 20 sacks of potting soil, and most recently several sacks of some unknown material at that residence. And, an unexplained excessive power consumption at the residence. It should be noted that in 1983 and 1984 the usage remained excessive throughout the year. However, in 1985 the power consumption dropped from 1500 to 3000 kilowatt hours per month during the summer months. That drop would be consistent with the moving of the grow operation from inside to outside for the summer months. The practice of moving indoors to outdoors is common for some cultivators. The unexplained failure to report a taxable addition, the basement addition, to the county assessor. That's a common practice of persons involved in criminal activity where government inspection would disclose that criminal activity. And the unexplained possession of commercial quantities of growing supplies, again the 300 pots and potting soil...he told the police he was in the tomato business and there is no indication of a tomato business at that residence, and finally the evidence of ongoing activity supported by the supplies at the residence seen by deputy Welsh on the April 6th, of '86, and the continued excessive power usage."

motion to controvert. He contends, and the trial court found, that the affidavit is inaccurate as to one fact: Defendant was not the driver of the truck hauling potting soil and pots from the florist that was stopped by police on suspicion of theft. Rather, the driver was defendant's roommate, who used defendant's name when stopped. The truck was registered to defendant. We agree with the trial judge that the misinformation was not a material inaccuracy; it related to the reason for investigating the situation further. Even when that inaccuracy is deleted, the affidavit would be sufficient to establish probable cause for the issuance of a search warrant.

Defendant argues, however, that, with or without the inaccuracy, the affidavit is insufficient. Our function, when faced with an insufficiency argument, is to determine whether a neutral magistrate could conclude, on the facts and circumstances set forth in the affidavit, that there was probable cause to believe that seizable items[2] were likely to be found on the premises to be searched. *See State v. Villigran,* 294 Or 404, 408, 657 P2d 1223 (1983); ORS 133.555(1), (2). In *State v. Anspach,* 298 Or 375, 692 P2d 602 (1984), the court stated:

> "The probable cause requirement means that the facts upon which the warrant is premised must lead a reasonable person to believe that seizable things will probably be found in the location to be searched." 298 Or at 380.

During the winter of 1984, defendant's then roommate, Pederson, a known drug abuser who had previously been involved in an indoor marijuana growing operation, helped defendant excavate under the east portion of the residence and construct a windowless, cinder block addition to create a full basement. The construction was not reported to the

---

[2] ORS 133.535 provides:

"The following are subject to search and seizure under ORS 133.525 to 133.703:

"(1) Evidence of or information concerning the commission of a criminal offense;

"(2) Contraband, the fruits of crime, or things otherwise criminally possessed;

"(3) Property that has been used, or is possessed for the purpose of being used, to commit or conceal the commission of an offense; and

"(4) A person for whose arrest there is probable cause or who is unlawfully held in concealment."

county assessor. A computer criminal history check on Pederson revealed an arrest in September, 1985, for driving under the influence, at which time he had used defendant's name and date of birth. In May, 1985, someone, not defendant, was seen hauling 20 sacks of potting soil and 300 pots in a pickup registered to defendant. When stopped on suspicion of theft, the driver told police that the potting soil and pots were for growing tomatoes. No evidence of any horticultural activity had been observed around the exterior of defendant's house. His roommate at the time of the affidavit, Mans, has a criminal history which includes an arrest for manufacturing marijuana. Several days before issuance of the warrant, Mans' pickup, carrying what appeared to be large sacks of potting soil or steer manure, was seen backed up to the basement of defendant's residence. The following morning the pickup was parked in the same place, and the sacks were gone.

Random checks by police officers during the months just before issuance of the affidavit indicate that defendant and his roommate rarely had visitors. In addition, defendant consumed an extraordinarily high amount of electricity.[3] In the affiant's experience and training, unexplained excessive power consumption indicates the use of 1000 watt metal hallide grow lights, used in most commercial indoor marijuana growing operations. The affiant consulted a marijuana grower's guide, which recommends that marijuana plants receive between 16 and 18 hours of artificial light per day. The electric company's records show that defendant consumed an average of 2774 kwh per month, as compared to an average 1390 kwh per month used by previous tenants of the same residence. Power usage reached as high as 4060 kwh in one month.

Viewed individually, the observations recorded in the affidavit are consistent with lawful activity but we conclude

---

[3] In *State v. Christen/Hankins,* 79 Or App 774, 780, 720 P2d 1303 (1986), we recognized that:

"the comparison of electricity consumption with normal residential usage is not misleading and is helpful to a determination of probable cause. It indicates that electricity far in excess of that normally used for residential purposes was being consumed on the premises, which was not accounted for by any objective evidence of a legal enterprise."

that the facts, considered collectively in a common sense manner, would lead a reasonable person to believe that evidence of a crime would be found at defendant's residence.

Defendant argues that the case at hand is akin to *State v. Christen/Hankins, supra* n 3, where an officer's investigation revealed extraordinarily high electric bills, payment in six crisp new one-hundred dollar bills by one of the defendants who indicated that he worked only occasionally, the presence of hoses, a drainage system, sprinklers, soil and an exhaust fan which turned on intermittently, the defendants' comment that they had excellent drainage, covered windows and no evidence of the wood products business, which the defendants claimed to operate. We held those activities to be sufficient to indicate to a trained officer the presence of an illegal marijuana growing operation but insufficient alone to establish probable cause. However, when those activities were considered with informants' tips that a large marijuana growing operation could be found on the premises to be searched, we held that there was probable cause, even though the basis of the informants' knowledge had not been established.

Nothing in *Christen/Hankins* linked the possession or manufacturing of marijuana to the premises to be searched except the informants' tips. Here, the affidavit states that residents of the premises to be searched had had prior involvement with indoor marijuana growing operations. This information, together with the other facts recited in the affidavit which indicated to a trained officer the presence of an illegal marijuana growing operation, constitute probable cause to believe that evidence of a marijuana growing operation would be found at defendant's residence. There is no error.

Affirmed.

**WARREN, J.,** dissenting.

Because I disagree with the majority's conclusion that the information in the affidavit constituted probable cause, I dissent.

Although defendant's activity was suspicious, the observations recorded in the affidavit were consistent with lawful activity and did not constitute probable cause to issue a search warrant. That a person associates with persons who

have manufactured drugs in the past could, in some circumstances, constitute probable cause. *See* 2 LaFave, *Search and Seizure,* § 3.6(c), 50 (1987). The illustrative cases, however, involve *present* or *immediately prior* criminal activity of a defendant's associates, which raised the level of suspicion to probable cause with regard to the defendant. LaFave, *supra,* § 3.6(c), 49-58. Similarly, in *State v. Christen/Hankins,* 79 Or 774, 720 P2d 1303 (1986), the informants' tip provided information of *present* criminal activity. Here, one of defendant's associates had been arrested for manufacturing more than an ounce of marijuana *in 1981.* Another was "known as a drug abuser" and had been involved in an indoor marijuana growing operation two years before the making of the affidavit. He was not arrested or charged. No inference that defendant was engaged in present criminal activity can be drawn from his associates' possible past criminal conduct, even taken together with the other facts in this case. There was not a sufficient basis for issuing a warrant to search defendant's residence.

I would reverse.