Argued and submitted April 29, 2010, affirmed May 11,
petition for review allowed October 20, 2011 (351 Or 254)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

GREGORY THOMAS McBRIDE,
*Defendant-Appellant.*

Marion County Circuit Court
07C50799; A139020

256 P3d 174

David O. Ferry, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Appellate Division, Office of Public Defense Services.

Jeff J. Payne, Assistant Attorney General, argued the cause for respondent. With him on the brief were John R. Kroger, Attorney General, and Jerome Lidz, Solicitor General.

Before Haselton, Presiding Judge, and Armstrong, Judge, and Edmonds, Senior Judge.

ARMSTRONG, J.

**ARMSTRONG, J.**

Defendant appeals a judgment of conviction for two counts of delivery of a controlled substance to a minor, ORS 475.906; one count of manufacturing marijuana, ORS 475.856; and two counts of endangering the welfare of a minor, ORS 163.575. He assigns error only to the trial court's denial of his motion for a judgment of acquittal on the two endangerment counts. He contends that there was insufficient evidence on which to find that he had violated ORS 163.575(1)(b) by permitting two minors to enter and remain in a residence where unlawful activity involving marijuana was conducted, because there was no evidence from which to find that he had authority to exclude the minors from the residence. The state counters that defendant had sufficient control over the minors and the residence to make him liable under ORS 163.575(1)(b) for permitting the minors to be in the residence. We affirm.

Freeman, a medical-marijuana cardholder, started growing marijuana in his home in 2006. He later decided to move the operation outdoors into a greenhouse, and he asked defendant to build one for him. Freeman, defendant, and defendant's girlfriend, Jensen, agreed to share the marijuana grown in the greenhouse—half to Freeman and the other half to defendant and Jensen. Neither defendant nor Jensen had medical-marijuana cards. Defendant built the greenhouse, and the three of them planted marijuana in the greenhouse in June 2007. In September 2007, they harvested the marijuana and brought the cuttings inside Freeman's house to dry.

Throughout the time of the foregoing events, Freeman's 15-year-old daughter, M, lived in the house with him, and, around July 2007, Freeman allowed M's 16-year-old friend, A, to move into the house. In early October 2007, Freeman asked defendant and Jensen to move into the house in order to "keep an eye on the house and help [him] with the kids and the marijuana," which they did. Freeman explained that he had asked defendant and Jensen to keep an eye on the house because he wanted additional adults in the home to help to prevent people from stealing the marijuana. Defense counsel questioned Freeman further about "the purpose of

[having defendant] at the house with regards to [Freeman's] daughter," which produced the following colloquy

"[Freeman]: [Defendant] was helping me with my daughter—keep[ing] an eye on her. I was, again, at work most of the day and I was concerned for her activities that she may have been involved in while I was gone.

"* * * * *

"[Defense Counsel]: * * * And what was the purpose of [defendant] being in the house with regards to those children?

"[Freeman]: To help, again, make sure that there wasn't anybody coming to the house that we didn't want there or didn't trust there.

"* * * * *

"[Defense Counsel]: Were there other people coming by the house—your ex-wife or her friends—that you were asking [defendant] to protect your children from?

"[Freeman]: Yes. There were a couple of—I don't know who they were specifically. They were driving by the house a couple of times. My daughter noticed them and she told me they were some people that she had met, through her mom, in Eugene.

"[Defense Counsel]: Now, hadn't [defendant] actually found what he was fearful was methamphetamine in some of the girl's stuff, and hadn't he presented that to you to destroy?

"[Freeman]: Yes.

"[Defense Counsel]: So he was trying to protect your daughter?

"[Freeman]: Yes. I believe that."

Jensen also testified about the circumstances under which she and defendant had come to live at Freeman's house. She explained that Freeman's "daughter had had some issues that took place and she was very troubled, so we went over there so she would not be alone when [Freeman] was at work." In response to questions by defense counsel, Jensen described the arrangement with Freeman to watch over M and A:

"[Jensen]: I just mainly was there to keep them company and to do the housework and cooking with them.

"[Defense Counsel]: Were there certain persons that you were instructed not to allow in the house?

"[Jensen]: Yes.

"[Defense Counsel]: And who were those people?

"[Jensen]: A young lady * * * and her brother, Bubba.

"[Defense Counsel]: And did you have trouble keeping them away from the house?

"[Jensen]: Yeah. If I was not there—I came home and occasionally they would be there, so it had to be with permission from both fathers that—the agreement if they were there, both of them knew about it."

In addition, Jensen testified that Freeman had given her and defendant permission to give M and A marijuana if they asked, that she and defendant had given the girls marijuana on a few occasions, and that she and defendant had smoked marijuana while M and A were present.

In late October 2007, police executed a search warrant at Freeman's home and arrested defendant and Jensen; M and A were in the house at the time. As noted earlier, defendant was subsequently tried and convicted of several crimes, including two counts of endangering the welfare of a minor. The trial court denied defendant's acquittal motion on the two endangerment counts, which defendant contends constitutes reversible error.

The statute on which the endangering counts were based is ORS 163.575(1)(b). It provides that "[a] person commits the crime of endangering the welfare of a minor if the person knowingly * * * *[p]ermits* a person under 18 years of age to enter or remain in a place where unlawful activity involving controlled substances is maintained or conducted[.]" (Emphasis added.) Defendant notes that we have previously construed the word "permit" in ORS 167.222, which establishes the crime of frequenting a place where controlled substances are used, and concluded that, "[b]efore one

can be said to 'permit' something, one must have authority to forbid it." *State v. Pyritz*, 90 Or App 601, 605, 752 P2d 1310 (1988). Applying that understanding of the word "permit" to the endangering statute, ORS 163.575(1)(b), defendant asserts that his acquittal motion on the endangering counts should have been granted because the record does not demonstrate "that defendant had any authority to *exclude* the girls from the home" and, thus, that he lacked the authority to "permit" them to "enter or remain" at the home. (Emphasis in original.) Defendant further argues that it would be unreasonable to infer that defendant had "the authority to evict or exclude residents from their home—especially when the residents at issue include the homeowner's child."

The state disagrees and argues that "the record establishes that defendant had authority both over the girls and over the property and, accordingly, he could 'permit' them to remain in the house where the drug activity occurred." The state points to evidence demonstrating that defendant had control over the house, including the ability to exclude people whom Freeman or defendant did not trust, and that Freeman "entrusted defendant with the care of the girls while he was gone[.]" Thus, under the state's view of ORS 163.575(1)(b), once defendant accepted broad control over the children and the premises, he was liable under ORS 163.575(1)(b) regardless of whether Freeman permitted the children to remain where unlawful activity involving controlled substances was taking place.

As framed by the parties, the issue here is whether, based on the evidence presented, a rational trier of fact could have found that defendant permitted M and A to enter or remain in Freeman's home while unlawful activity involving marijuana was occurring in the home. As the parties' arguments suggest, resolution of that question depends on how the word "permits" is understood to operate in ORS 163.575(1)(b).

We begin by noting that the word "permit," which is not defined for purposes of ORS 163.575, has a range of meanings. "Permit" can be used to denote a narrow concept, such as a formal expression of consent or authorization, but it also can have a broader meaning, such as to allow, tolerate,

or make possible.[1] As we will explain, the legislative history of ORS 163.575(1)(b) provides useful insight into the intended meaning of "permit" in the statute.

The legislature enacted ORS 163.575(1)(b) as part of the 1971 revision of the Oregon Criminal Code. *See* Or Laws 1971, ch 743, § 177. The Criminal Law Revision Commission that proposed the 1971 Oregon Criminal Code crafted ORS 163.575 as a replacement for *former* ORS 167.210—a statute on contributing to the delinquency of a minor—which the Supreme Court had held in *State v. Hodges*, 254 Or 21, 457 P2d 491 (1969), to be unconstitutionally vague. Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report § 177, at 178 (July 1970) (explaining history of ORS 163.575, *viz.*, that the statute was "designed to provide coverage for specific acts injurious to the welfare of minors not specifically prohibited elsewhere in the proposed Code"). The minutes to one of the commission's subcommittee meetings reflects that Roger Wallingford, Research Counsel for the Criminal Law Revision Commission, explained that the endangerment statute "attempts to cover everything the statute on contributing to the delinquency of a minor encompassed which has not been provided for elsewhere in the proposed code. It is a 'contributing' statute set out in specific language." Minutes, Criminal Law Revision Commission, Subcommittee No. 2, Mar 6, 1970, at 10.[2]

From that history, it is evident that the legislature adopted ORS 163.575(1)(b) to shield children from unlawful

---

[1] *See, e.g., Webster's Third New Int'l Dictionary* 1683 (unabridged ed 2002) (defining "permit" to mean "**1** : to consent to expressly or formally : grant leave for or the privilege of : allow, tolerate ‹ ~ smoking › ‹ ~ an appeal › ‹ ~ access to records › **2** : to give (a person) leave : authorize ‹ obliged to ~ others to use his patent—Tris Coffin › * * * ‹ ~ me to offer my congratulations › * * * **4** : to make possible" (boldface in original)); *State v. Porter*, 241 Or App 26, 30, 32, 249 P3d 139 (2011) ("[I]n some contexts, 'permitting' carries a rather broad meaning, and in others, a narrower meaning.").

[2] Before its repeal, *former* ORS 167.210 provided that, "[w]hen a child is a delinquent child as defined by any statute of this state," a person would commit the crime of causing or contributing to the delinquency of a child if the person was "responsible for, or by any act encouraging, causing or contributing to the delinquency of such child, or [if the] person * * * by threats, command or persuasion, endeavors to induce any child to perform any act or follow any course of conduct which would cause it to become a delinquent child[.]"

drug activities and the actions of adults who expose children to or involve them in those activities. In accordance with that purpose, we conclude that the legislature intended the word "permit" in ORS 163.575(1)(b) to have a broad rather than narrow meaning and, therefore, to apply to people who have authority over a minor or a place and who, because of their exercise of that authority, make it possible for a minor to be exposed to unlawful drug activity. In other words, and contrary to defendant's position, the statute extends to a person, such as defendant, who has been given authority over a minor or premises and who accepts that authority knowing that it involves allowing a minor to be in a place where unlawful drug activity is occurring. *Cf. State v. Mack*, 219 Or App 119, 128-29, 183 P3d 191, *rev den*, 345 Or 301 (2008) (defendant entitled to acquittal on first-degree child neglect charge, ORS 163.547(1)(a) (2001), because evidence did not establish that homeowner's boyfriend, who had a room in the home, had control over the homeowner's child or authority to exclude the child from the home). Accordingly, the trial court did not err in denying defendant's motion for a judgment of acquittal on the endangerment counts.

Affirmed.