Argued and submitted March 6, decision of Court of Appeals reversed; judgment of circuit court reversed in part and affirmed in part, and case remanded to circuit court for further proceedings June 28, 2012

## STATE OF OREGON,
*Respondent on Review,*

*v.*

## GREGORY THOMAS McBRIDE,
*Petitioner on Review.*

(CC 07C50799; CA A139020; SC S059650)

281 P3d 605

David O. Ferry, Deputy Public Defender, Office of Public Defense Services, Salem, argued the cause for petitioner on review. With him on the brief was Peter Gartlan, Chief Defender.

Jeff J. Payne, Assistant Attorney General, Salem, argued the cause for respondent on review. With him on the brief were John R. Kroger, Attorney General, and Anna M. Joyce, Solicitor General.

LINDER, J.

## LINDER, J.

Defendant lived in his friend's home where the two grew, used, and sold marijuana. The friend's teen-aged daughter, and her friend, also lived there. Defendant occasionally smoked marijuana in the home, sometimes with the teenagers. Based on those circumstances, defendant was charged with manufacturing a controlled substance (ORS 475.856), delivering a controlled substance to a minor (ORS 475.906), and two counts of endangering the welfare of a minor.[1] At his ensuing trial, defendant moved for judgment of acquittal on the child-endangerment charges. The trial court denied the motion, and a jury ultimately convicted defendant on those counts. The Court of Appeals affirmed. *State v. McBride*, 242 Or App 594, 256 P3d 174 (2011). Defendant sought review, challenging only his child-endangerment convictions. As we will explain, we conclude that the trial court erred in denying defendant's motion for judgment of acquittal on those charges, and we therefore reverse those convictions.

The pertinent facts are not in dispute. Defendant's friend, Freeman, grew marijuana plants in a greenhouse outside his home and dried the plants inside, in a spare bedroom. Defendant had been helping Freeman with the growing operation for a short time when Freeman's 15-year-old daughter and her 16-year-old friend moved into the home. Freeman was concerned that his daughter was using methamphetamine or associating with methamphetamine users while he was at work. He also was afraid that his home would be a target for thieves trying to steal the marijuana. For those reasons, Freeman asked defendant to move into the home to "keep an eye on the house and help [him] with the kids and the marijuana."

Defendant moved in. When he did so, Freeman instructed him not to allow certain people at the house. If any of those people were in the home when defendant returned from work, he was to ask them to leave. In addition,

---

[1] Defendant also was charged with being a felon in possession of a firearm. The jury convicted him of the drug charges and acquitted him of the firearm offense.

Freeman instructed defendant to provide the teenagers with marijuana when they asked for it. Freeman also provided his daughter with marijuana, and he and defendant used marijuana with the teenagers.[2]

About three weeks after defendant moved in, police executed a search warrant on Freeman's property and arrested defendant. As noted, defendant was charged with, among other crimes, two counts of child endangerment. In support of those charges, the state presented evidence at trial that defendant had participated in Freeman's marijuana manufacturing operation and that Freeman had asked him to live in the home to be a caretaker for the two teenagers. At the close of the state's case, defendant moved for judgment of acquittal on the child-endangerment counts. The trial court denied the motion, and defendant ultimately was convicted of endangering the welfare of a minor.

Defendant appealed, arguing that the state had not demonstrated that he had sufficient control over the residence or the teenagers to have "permitted" them to "enter or remain" in their home, as the child-endangerment statute requires. Under that statute, a person commits the crime of endangering the welfare of a minor if the person knowingly "[p]ermits a person under 18 years of age *to enter or remain* in a place where unlawful activity involving controlled substances is maintained or conducted[.]" ORS 163.575(1)(b) (emphasis added). Defendant argued specifically that, because the record did not show that he had authority to *exclude* the teenagers from their home, the state had failed to prove that he had any authority to "permit" them "to enter or remain" there.

The Court of Appeals disagreed. It concluded that the legislature intended the word "permit" to have a broad meaning, such as to allow, tolerate, or make possible, and, therefore, it intended the statute

> "to apply to people who have authority over a minor or a place and who, because of their exercise of that authority,

_____

[2] Defendant's girlfriend also was involved in the marijuana growing operation, moved into the house with defendant, and was asked by Freeman to keep an eye on the teenagers. Her conduct is not at issue here.

make it possible for a minor to be exposed to unlawful drug activity. In other words, and contrary to defendant's position, the statute extends to a person, such as defendant, who has been given authority over a minor or premises and who accepts that authority knowing that it involves allowing a minor to be in a place where unlawful drug activity is occurring."

*McBride*, 242 Or App at 601. The Court of Appeals' interpretation was based on the legislature's intent that the child-endangerment statute "'cover everything'" not prohibited elsewhere in the code that had been criminalized by the former statute defining the crime of contributing to the delinquency of a minor, which this court had determined to be unconstitutionally vague. *Id*. at 600 (quoting Minutes, Criminal Law Revision Commission, Subcommittee No 2, Mar 6, 1970, at 10); *see State v. Hodges*, 254 Or 21, 457 P2d 491 (1969) (holding unconstitutional the statute defining the crime of contributing to the delinquency of a minor). The legislature intended the child-endangerment statute to be "'a "contributing" statute set out in specific language.'" *McBride*, 242 Or App at 600 (quoting Minutes, Criminal Law Revision Commission, Subcommittee No 2, Mar 6, 1970, at 10). Consequently, the Court of Appeals concluded, the term "permit," as used in the child-endangerment statute, must be given a particularly broad meaning. *Id*. at 600-01.

On review, defendant renews his argument that he had insufficient authority over either the teenagers or the home to have "permitted" the teenagers to enter or remain there. In defendant's view, a person may not permit what that person lacks the authority to prohibit. The state argues for a broader meaning of "permit," one that would encompass "situations in which a person allows or enables children to be in the presence of controlled substances." Based on that definition, in the state's view, defendant permitted the teenagers to enter or remain in the house because he was "participating in a growing operation, maintaining a marijuana-selling business in the house, acting as caretaker for the children, providing them with marijuana and monitoring their activities[.]" The state posits in the alternative that, even under defendant's interpretation of the statute, his conduct at the house and his status as a

caretaker demonstrate that he had the authority to prevent the teenagers' continued presence in the home.

To determine the legislature's intent in using the word "permits" in paragraph (b) of the child-endangerment statute, we consider the statute's text, context, and legislative history. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009). The text, as quoted above, defines child endangerment as occurring when a person "[p]ermits a person under 18 years of age to enter or remain in a place" where illegal drug activity is occurring. ORS 163.575(1)(b). That wording is significant to our understanding of the statute's meaning. The legislature in some circumstances has made it either a crime, or a more serious crime, to engage in particular conduct in the presence of a minor. *See, e.g.*, ORS 163.160(3)(c) (elevating fourth-degree assault to felony fourth-degree assault if committed in the immediate presence of, or witnessed by, the person's minor child). The focus of this crime, however, is different. The illegal conduct is not the use of drugs in a minor's presence. It is, instead, the act of permitting the minor to enter or remain where illegal drug activity is occurring. In other words, the statute proscribes conduct specifically directed at a minor.

The legislative history supports that text-based conclusion. The child-endangerment statute, ORS 163.575, was passed as part of the 1971 overhaul of the Oregon Criminal Code. Commentary by the legislatively appointed commission that proposed the code states that the child-endangerment statute was "designed to provide coverage for specific acts injurious to the welfare of minors not specifically prohibited elsewhere" in the code. Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report, 162 (July 1970). The purpose, as the Court of Appeals noted, was to criminalize conduct that previously was proscribed as "contributing to the delinquency of a minor," but to do so with sufficient specificity to avoid unconstitutional vagueness. *Id.*[3]

---

[3] The Court of Appeals concluded from that history that "permit" must have a broad meaning to accommodate the wide range of conduct proscribed by the former statute defining the crime of contributing to the delinquency of a minor. In our view, the history indicates that several provisions throughout the code "relat[ing] to conduct detrimental to the welfare of minors" in combination serve that purpose.

With respect to paragraph (b) of ORS 163.575(1), which prohibits permitting a minor to enter or remain where illegal drug activity is occurring, the commission noted that, "[i]f a minor is sold or given illegal drugs, or if the actor maintains a place resorted to by drug users or used for the unlawful keeping or sale of drugs, the crime of criminal activity in drugs or criminal drug promotion would be committed"—not the crime of endangering the welfare of a minor. *Id.* Thus, the legislative history confirms what we concluded based on the text alone: the statute's focus is on permitting a minor to enter or remain in a place where illegal drug activity is occurring; it is not on the act of engaging in illegal drug activity with minors present.

The legislative history also is helpful in determining more specifically what type of conduct the legislature meant to capture with the word "permit" in ORS 163.575(1)(b), which has a variety of plain meanings. *See Colby v. Gunson*, 349 Or 1, 5, 238 P3d 374 (2010) (in determining legislative intent, court applies plain meaning of undefined terms). The dictionary defines "permit," in pertinent part, as follows:

> "**1:** to consent to expressly or formally: grant leave for or the privilege of: ALLOW, TOLERATE <~ smoking> <~ an appeal> <~ access to records> **2:** to give (a person) leave: AUTHORIZE <obliged to ~ others to use his patent \* \* \*> <one must ~ oneself . . . a certain margin of misstatement \* \* \*> <~ me to offer my congratulations> \* \* \* **4:** to make possible <building has been divided . . . to ~ an unobstructed view \* \* \*> \* \* \* **syn** see LET."

*Webster's Third New Int'l Dictionary* 1683 (unabridged ed 2002) (capitalization and boldface in original).[4] So defined,

---

Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report, 162. The commission listed some of those other provisions (*e.g.*, recklessly endangering another person, sale of obscene material to a minor) and stated that those sections would capture "in almost every instance" the conduct that had been prosecuted under *former* ORS 167.210 (1969), *repealed by* Or Laws 1971, ch 743, § 432 (contributing to the delinquency of a minor). *Id.* The child-endangerment statute, the commission noted, "is designed to provide coverage for specific acts \* \* \* not specifically prohibited elsewhere" in the code. *Id.* From that history, we cannot conclude that the legislature intended "permit" to have its broadest possible meaning.

[4] The omitted third definition is archaic: "to give over : COMMIT <to the gods ~ the event of things—Joseph Addison>." *Webster's Third New Int'l Dictionary* 1683 (unabridged ed 2002) (capitalization and boldface in original).

"permit" has many meanings that require affirmative conduct, including to expressly or formally consent, to provide needed authority, or to create necessary conditions (*i.e.*, "to make possible"). In contrast, some of the examples seem to include entirely passive behavior, such as merely tolerating conduct (*e.g.*, smoking). Likewise, "to make possible" could include conduct that only indirectly allows an event to occur, rather than expressly or actively facilitating it.

The synonyms of "permit" further illustrate that the word generally is intended to require some affirmative conduct, but can be used to imply passive tolerance or inaction. The dictionary description of "let" is particularly helpful:

> "LET is less formal than PERMIT or ALLOW * * * ALLOW and PERMIT both imply more strongly than the comparable use of LET the power or authority to prohibit or prevent or to refrain from prohibiting or preventing. ALLOW usu. implies a forbearing to prohibit; PERMIT implies a more express willing or acquiescing <nothing is *permitted*, everything is *allowed*>."

*Id.* at 1297 (capitalization and italics in original). Similarly, "allow" is defined as synonymous with "permit" when the latter is qualified to imply passivity—"to permit by way of concession" and "to permit by neglecting to restrain or prevent." *Id.* at 58. By contrast, the definition of "authorize" implicates a more express, affirmative meaning of permit: "to endorse, empower, justify, or permit by or as if by some recognized or proper authority (as custom, evidence, personal right or regulating power)." *Id.* at 146.

According to the legislative history of the child-endangerment statute, the intended meaning of "permit" in ORS 163.575(1)(b) is limited to criminalizing behavior not prohibited elsewhere in the code. The passive meaning of permit—to allow or tolerate, rather than to authorize or affirmatively make possible—would not serve that purpose. In the context of ORS 163.575(1)(b), that passive meaning would criminalize passive tolerance of or failure to prevent a minor from entering or remaining in a place where illegal drug activity is occurring. Under many scenarios, however, that same conduct would be criminalized as first-degree child neglect:

"A person having custody or control of a child under 16 years of age commits the crime of child neglect in the first degree if the person knowingly leaves the child, or allows the child to stay:

"(A)   In a vehicle where controlled substances are being criminally delivered or manufactured;

"(B)   In or upon premises and in the immediate proximity where [certain illegal drug activities are taking place.]"

ORS 163.547(1)(a). The conduct proscribed by that statute— allowing a child to stay in the immediate proximity of illegal drug activity—would render paragraph (b) of ORS 163.575(1) redundant if "permit" meant nothing more than "allow."[5] In contrast, the statutes would reach different conduct if, consistently with the stated purpose of the child-endangerment provisions in ORS 163.575(1)(b), "permit" requires the kind of affirmative conduct usually implied by that word, in contrast to "allow."

We disagree with defendant, however, that ORS 163.575(1)(b) requires a person to have legal authority over a minor or over the place where drug activity is occurring. If the legislature had intended that statute to be so narrow, it easily could have used the word "authorizes" instead of "permits." It did not. To permit includes to legally authorize, but as we have already described, the former is a broader term. A person may "permit" a child to enter or remain in a place for purposes of ORS 163.575(1)(b), regardless of the person's legal authority over the situation, by affirmatively making possible the child's conduct. Adults often possess a situational or social authority over children, especially small children. As a result, a child may request an adult's

_____

[5] To be sure, in some situations, child neglect and child endangerment are distinguishable on other grounds—child neglect reaches a more limited group of defendants (those with actual custody or control of a child, such as a parent or guardian), victims (those under age 16), and harmful situations (*e.g.*, child allowed to stay in vehicle where illegal drugs are being manufactured or delivered). Nonetheless, if "permit" means the same thing as "allow" in the two statutes, which were enacted at the same time in 1971, the statutes would criminalize the same conduct any time that a defendant had custody of a minor, the minor was under 16, and the "place" where the child remained was "in the immediate proximity" of illegal drug activity. Here, for example, Freeman's conduct with respect to his 15-year-old daughter likely would have violated both statutes if "permit" has the same meaning as "allow."

permission to enter a place, to go inside to play, or to pet an animal, for example, regardless of whether that adult has any legal authority over the child or the place to be entered. When an adult agrees and gives the child leave to enter, the adult expressly has permitted the child to do so. Also, an adult potentially may permit a child to enter or remain without *any* recognized authority by, for example, physically assisting the child in unlocking a door or unlatching a gate out of a child's reach. Thus, a person's authority is a factor to be considered and may be evidence of that person's permission. But actual authority—legal or otherwise—over a minor or place is not the only proof that will suffice to show that a person effectively "permitted" a minor to enter or remain in a place within the meaning of ORS 163.575(1)(b).

To prove a violation of ORS 163.575(1)(b) in this case, therefore, the state must demonstrate that defendant engaged in some affirmative conduct authorizing or otherwise making it possible for the minors to enter or remain in the home.[6] The evidence in this case misses that mark for at least two reasons. First, ORS 163.575(1)(b) proscribes conduct directed at minors; the text and legislative history make clear that illegal drug activity itself is not the target of that statute. The state's emphasis on defendant's role in maintaining an illegal drug operation in a place where he knew that minors would remain therefore does not advance its case. Second, the statute requires some *affirmative* conduct by defendant that permitted the girls to enter or remain in the home. In that respect, the state points to defendant's acceptance of a caretaker position with the knowledge of illegal drug activity in the home, which the state asserts enabled the girls to remain there. But the girls lived in the home with Freeman's permission before defendant moved in. The state asserts that defendant permitted them to remain in the home after he moved in

---

[6] The word "place" also is potentially open for interpretation as well. In this case, however, no issue has arisen whether the legislature intended that word to be understood broadly (*e.g.*, permitting a child to enter or remain in a house where drug use was occurring somewhere inside, such as a bedroom in the home, even if the child was not permitted to enter the bedroom) or narrowly (*e.g.*, permitting the child to enter the specific area of a home in which the illegal drug activity was occurring). Nothing in our opinion should be understood to resolve any issue about the intended scope of that word, as used in ORS 163.575(1)(b).

by then failing to "take steps to protect the children and prevent their continued presence there[,]" by, for example, calling the police. As we have explained, in the absence of actual authority, a failure to intervene is not the type of conduct required by the word "permit" in ORS 163.575(1)(b).

We therefore conclude that defendant's conduct did not fall within the purview of the child-endangerment statute. His drug activities in the home, including giving the teenagers marijuana, constituted criminal conduct (*i.e.*, manufacturing of marijuana and delivery of marijuana to a minor) for which he was convicted. The state has pointed to no conduct different from or in addition to defendant's drug crimes that "permitted" the teenagers "to enter or remain" in the home. ORS 163.575(1)(b) does not create an obligation for all caretakers to attempt to remove minors from homes where drug activity is taking place. Rather, it is targeted at people who authorize or affirmatively make possible a minor's presence there. In this case, defendant took no action that "permitted" Freeman's daughter and her friend to enter or remain in their house.

In sum, child endangerment occurs under ORS 163.575(1)(b) when a person takes some conduct, directed at a minor, authorizing or affirmatively making it possible for that minor to enter or remain in a place where unlawful drug activity is taking place. Defendant's conduct did not satisfy that standard. Viewed in the light most favorable to the state, the evidence shows only that defendant failed to take any action to prevent the teenagers from remaining in their home where illegal drug activity was taking place. That failure to act was not proscribed by ORS 163.575(1)(b).

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed in part and affirmed in part, and the case is remanded to the circuit court for further proceedings.