STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

SEAN DAVID SPARKS,
*Defendant-Appellant.*

Lane County Circuit Court
201121071; A150323

340 P3d 688

Sarah Peterson argued the cause for appellant. With her on the briefs was Metcalfe & Peterson LLC.

Andrew M. Lavin, Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Armstrong, Presiding Judge, and Nakamoto, Judge, and Egan, Judge.

NAKAMOTO, J.

### NAKAMOTO, J.

Defendant appeals a judgment of conviction for multiple drug offenses and two counts of first-degree child neglect stemming from an illegal marijuana-growing operation that he conducted at three residences.[1] Before trial, defendant moved to suppress the evidence that police discovered at the residences. The trial court denied that motion. After the state's case-in-chief, defendant moved for judgments of acquittal on several of the charges. The trial court denied those motions as well. Defendant also objected to one of the state's proposed jury instructions. The court overruled that objection and delivered the disputed instruction. Defendant raises eight assignments of error challenging the above rulings. For the reasons below, we reverse and remand on defendant's convictions for first-degree child neglect, ORS 163.547, reverse the conviction for possession of LSD, ORS 475.840, remand for resentencing, and otherwise affirm.

## I. FACTS AND PROCEDURAL HISTORY

The parties do not dispute the following relevant facts. Eugene Police Detective Lowe, a narcotics enforcement officer, began investigating defendant after observing him loading numerous bags of potting soil into a rented van. Lowe followed defendant to a residence on Beech Place and began regular surveillance of that residence. Lowe observed two cars and a minivan regularly parked at the residence. One of the cars was registered to defendant, the second was registered to an individual named Kimm, and the minivan was registered to defendant's deceased uncle.

Assistant District Attorney Montgomery signed and issued a "grand jury subpoena" *duces tecum* to the custodian of records of the Eugene Water & Electric Board (EWEB).

---

[1] More specifically, defendant was charged with and found guilty of child neglect in the first degree, ORS 163.547 (Counts 1 and 2); unlawful manufacture of marijuana, ORS 475.856 (Counts 3, 4, and 5); unlawful manufacture of hashish, ORS 475.856 (Count 6); unlawful delivery of hashish, ORS 475.860 (Count 7); unlawful possession of hashish, ORS 475.864 (Count 8); possession of LSD, ORS 475.840 (Count 9); possession of psilocin mushrooms, ORS 475.840 (Count 10); unlawful delivery of marijuana for consideration, ORS 475.860 (Count 11); and unlawful possession of more than one ounce of marijuana, ORS 475.864 (Count 12).

The subpoena required production of "power subscriber information, power records, and method of payment for the past 2 years" for the Beech Place residence and a second residence on East 32nd. The one-page subpoena commanded the EWEB custodian of records to "appear before the Lane County Grand Jury" at the courthouse "as a witness before the Grand Jury" on a certain date and at a specific time. The subpoena also notified the custodian to

"[b]ring this subpoena if appearing as a witness or information may be e-mailed directly to Detective Lowe at [Lowe's email address]. Should you have any questions regarding this subpoena, please call Detective Lowe at [Lowe's phone number]."

The subpoena further specified, *"MANDATORY APPEAR-ANCE IS NOT REQUIRED IF RECORDS PROVIDED."* (Capitalization and italics in original.) The subpoena concluded with the statement that "[t]his information being requested is pursuant to an official investigation being conducted by Detective [] Lowe of the Eugene Police."

Lowe received the subscriber and usage information from EWEB several days later. The usage information consisted of the number of kilowatts used each month at each address. Lowe later stated in an affidavit that the requested records demonstrated that "[d]uring the last 24 months utility usage has remained unusually high" at both addresses and that "it is extraordinary for a residence the size of either of the above locations to be generating this much power usage and not be involved in the manufacture of marijuana."

Lowe later observed the minivan one night at the East 32nd residence, which had previously appeared vacant, with the curtains always closed. Lowe stated that, on the night that he noted the minivan in the driveway, he also observed defendant exiting the residence and "the overwhelming odor of fresh marijuana" around and emanating from the location.

The following day, Lowe called the Oregon Medical Marijuana Program (OMMP) and learned that Kimm was a registered patient permitted to grow for her own use and that defendant was registered as her caregiver. As Kimm's

caregiver, defendant was allowed to transport and administer marijuana to Kimm but was not allowed to grow marijuana. Neither the Beech Place home nor the East 32nd residence was registered as a grow site. However, Kimm's previous residence, on Ferry Street, was registered as a grow site, with Kimm as the only grower and patient. Lowe also discovered that defendant had previously been convicted in Lane County of unlawful delivery of marijuana.

Lowe submitted an affidavit setting forth the facts above and requesting warrants to search the Beech Place and East 32nd residences as well as defendant's and Kimm's person for evidence of an illegal marijuana manufacture and distribution enterprise. Lowe did not seek authorization to search the Ferry Street residence because it was registered with OMMP as Kimm's marijuana-growing site. The court issued the warrants.

Lowe and four other plainclothes officers served and executed the search warrants, beginning at the Beech Place residence. When defendant opened the door, Lowe immediately smelled the "overwhelming odor" of marijuana "just waft out of the house." Kimm and her two children (ages 11 and 14) were present at the Beech Place residence during the search.

Lowe interviewed defendant while officers searched the premises. Lowe asked defendant "if he was still using the home on Ferry Street for purposes of growing marijuana," and defendant responded, "yes." Lowe then asked if he could have defendant's consent to search the Ferry Street residence. Defendant consented.

The search of the Beech Place residence revealed 33 mature marijuana plants growing in a room constructed within the attached garage. Lowe also found growing equipment and supplies in the garage. In a closet in the master bedroom, police found large bags of packaged marijuana buds, various jars with marijuana material, a digital scale, a small bag of psilocin mushrooms, and a bowl containing marijuana residue. Police also discovered some hashish in the bedroom, as well as a vial of LSD in the drawer of a dresser in the bedroom. There were postal shipping boxes

in one of the bedrooms, which the evidence suggested defendant used to ship marijuana to customers.

Lowe later testified that "there were locks on the door" to the garage and that defendant "had to open the locks on the door to let" Lowe in to the garage. Lowe also stated that "the children had no keys to the locks to the garage[.]" Both the door to the master bedroom and the door to the closet were open when police searched the home. Kimm stated that the door to the master bedroom was not locked when she was home and that the children had access to the bedroom. Kimm also acknowledged that there was no lock on the closet and that she and defendant normally stored marijuana in that closet.

Before trial, defendant moved to suppress the evidence obtained in the searches. Defendant asserted that the police needed a warrant to obtain the EWEB records because he had a privacy right in those records. Because the police did not get a warrant (and no exception justifying a warrantless search applied), defendant reasoned, they conducted an illegal search when they obtained the power usage information. Defendant also argued that the court should suppress the power usage records for the independent reason that the subpoena was unlawful. In defendant's view, without the power usage information that Lowe included in his affidavit to the court requesting the search warrants, there was not probable cause to support the warrants. Defendant argued in the alternative that, even with the power usage information, the affidavit failed to establish probable cause. Finally, defendant contended that the illegality of the Beech Place search vitiated any consent that he gave to search the Ferry Street residence. At the hearing on defendant's motion, defendant elicited testimony from Montgomery tending to establish that Montgomery had not presented defendant's case to the grand jury that was sitting at the time and that, therefore, the grand jury had not directed Montgomery to issue the subpoena for the EWEB records.

The state opposed defendant's motion, arguing that he had no privacy right in the usage records, that the subpoena was lawful, that Lowe's affidavit established probable cause to issue the search warrants, and that defendant's

consent to search the Ferry Street residence was valid. The trial court agreed with the state, rejecting all of defendant's arguments.

At trial, Kimm testified that she lived at the Beech Place home with defendant and her two children. She stated that defendant was not the children's father and that he had been her boyfriend for the past four years. According to Kimm, defendant "sometimes" picked up the children after school and dropped them off places, "occasionally * * * baby-s[a]t" them, and took care of them when Kimm worked out of the home, including at times during the month of February 2011. Kimm also testified that defendant cared for her children once for "[a] couple days" when Kimm traveled to Hawaii but did "not really" "have any say over what they did during that time period[.]" Kimm stated that defendant had "zero control" over the children; that, although "he might watch them from time to time[,]" "[h]e has no say in what they do and how they live their lives." In Kimm's view, because her name was on the lease for the Beech Place residence, defendant lacked authority to keep her or her children from staying there.

At the close of the state's case, defendant moved for judgments of acquittal on the two counts of first-degree child neglect, ORS 163.547(1)(a)(B).[2] Defendant argued that, given Kimm's testimony as to his lack of authority over her children, the state failed to adduce sufficient evidence that defendant had the requisite "custody or control" of the children. Defendant also contended that there was insufficient evidence that the children were ever "in the immediate proximity" of the drug manufacturing, because defendant grew the marijuana in the garage, which was partitioned from the home by a wall and locked door and which the children could not access. Defendant also moved for judgments of acquittal on the various counts involving hashish, LSD, and psilocin mushrooms. Defendant argued as to all of those counts that

---

[2] In relevant part, ORS 163.547(1)(a)(B) provides:

"A person having custody or control of a child under 16 years of age commits the crime of child neglect in the first degree if the person knowingly leaves the child, or allows the child to stay * * * [i]n or upon premises and in the immediate proximity where controlled substances are criminally delivered or manufactured for consideration or profit * * *."

there was "simply no evidence that they belonged to [defendant] rather than to [Kimm]."

The state, citing *State v. Mack*, 219 Or App 119, 183 P3d 191, *rev den*, 345 Or 301 (2008), argued that defendant had "control" of the children because he had control of the residence where they lived with their mother and defendant. The state argued that there was sufficient evidence of "immediate proximity" because there were "drugs that had been manufactured" in a closet that the children could enter, and because the children could also enter the locked garage. With regard to the hashish, LSD, and psilocin mushroom charges, the state argued that there was sufficient evidence to survive defendant's motion for judgments of acquittal.

The trial court denied defendant's motions. As to the child-neglect charges, the court observed that there was no issue that defendant had custody, and so the issue was whether he had control over the children. The court concluded that, under *Mack*, defendant had sufficient control. The court did not specifically address defendant's argument regarding "immediate proximity."

The state subsequently requested a special jury instruction that reflected its interpretation of "control" as used in the child-neglect statute. Defendant objected to the instruction as legally incorrect and proposed an alternative instruction that would have stated that "a person has control of a child either by virtue of the relationship to the child or by virtue of the person's ability to exclude the child from [] premises." In the alternative, defendant argued that no instruction on "control" should be given because the state's proposed instruction was too "broad." The court denied defendant's proposed alternatives and delivered the following instruction to the jury:

> "A person has control of a child either by virtue of their relationship to the child or by virtue of the person's ability to control the premises where the child is physically present."

The jury returned guilty verdicts on all counts, and the court sentenced defendant to 55 months in prison.

## II. MOTION TO SUPPRESS

We begin with defendant's first assignment of error, regarding the trial court's denial of his motion to suppress the evidence. We review a trial court's denial of a motion to suppress for errors of law, and we are bound by the trial court's express and implied findings that are supported by sufficient evidence in the record. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993).

We first consider whether defendant had a right to privacy in the information that Lowe obtained from EWEB pursuant to the subpoena. Whether a constitutionally protected privacy interest exists is a question of law. *State v. Johnson*, 340 Or 319, 336, 131 P3d 173, *cert den*, 549 US 1079 (2006). Article I, section 9, of the Oregon Constitution provides, in pertinent part, "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure * * *."[3] As its terms indicate, Article I, section 9, applies only when government officials engage in a "search" (or, not relevant here, a "seizure"). *State v. Howard/Dawson*, 342 Or 635, 639, 157 P3d 1189 (2007). A "search" occurs when a person's privacy interests are invaded. *Id.* at 640. Under the Oregon Constitution, a person may have a constitutionally protected privacy interest even when there is no physical or sensory invasion into the person's own possessions or space. *Johnson*, 340 Or at 336. However, if "the government conduct did not invade a privacy interest, then no search occurred; Article I, section 9, is not implicated, and the inquiry is concluded." *State v. Davis*, 237 Or App 351, 355, 239 P3d 1002 (2010).

Applying the above principles, the Supreme Court held in *Johnson* that, under the Oregon Constitution, a defendant has no right to privacy in cell phone usage records

---

[3] On appeal, defendant invokes the Fourth Amendment to the United States Constitution in his privacy-interest argument. However, defendant did not cite the Fourth Amendment or raise a federal constitutional argument in his motion to suppress or the memorandum accompanying it, nor did he mention the Fourth Amendment during the suppression hearing. As a result, defendant's Fourth Amendment argument is not preserved, and we do not address it. ORAP 5.45(1); *see State v. Magana*, 212 Or App 553, 566 n 5, 159 P3d 1163, *rev den*, 343 Or 363 (2007) (a defendant's arguments under Article I, section 9, of the Oregon Constitution do not preserve federal Fourth Amendment arguments).

maintained by the defendant's cellular service provider. The court rejected the defendant's argument that he had a privacy interest in those phone records because "they pertained to his activities and transactions in areas that the legislature has recognized as private." *Johnson*, 340 Or at 335. The court reasoned:

> "Defendant clearly had a cognizable privacy interest in the *content* of his telephone calls. *See* ORS 133.724 (setting out requirement that police obtain judicially issued warrant to intercept a telephonic communication). However, we cannot identify a source of law that establishes that defendant also had some interest in keeping private any records kept by a third party, his cellular telephone provider, respecting his cellular telephone usage. The cellular telephone provider generated and maintained those records from the provider's own equipment and for the provider's own, separate, and legitimate business purposes (such as billing). * * * Neither are we aware of any principle that would prevent the cellular telephone provider from responding to a proper subpoena."

*Id.* at 336 (emphasis in original). The court thus held that the trial court did not err in denying the defendant's motion to suppress evidence of his phone usage records. *Id.*

In *State v. Delp*, 218 Or App 17, 27, 178 P3d 259, *rev den*, 345 Or 317 (2008), relying on *Johnson*, we held that the defendant did not have a protected privacy interest in subscriber information held by his Internet service provider. We reasoned that,

> "as in *Johnson*, the information that the government obtained from [the service provider] was independently maintained by [the service provider] for its own purposes. Thus, the question, as in *Johnson*, is whether a source of law establishes that defendant has some interest in keeping private the information maintained by a third party respecting his Internet usage."

*Delp*, 218 Or App at 25. Because the defendant failed to direct the court to any such source of law, and we were unable to identify "any principle that would prevent [the service provider] from responding to a proper government subpoena concerning his subscriber information," we concluded that the trial court did not err in denying the defendant's motion

to suppress evidence obtained as a result of that subpoena. *Id.* at 27.

For the same reasons, we hold here that defendant has failed to establish that he has a constitutionally cognizable privacy interest in the "power subscriber information, power records, and method of payment for the past 2 years" that the state requested and obtained pursuant to the subpoena. The record indicates that, as in *Johnson* and *Delp*, the information was "generated and maintained" by a third-party utility provider, EWEB, for the provider's "own, separate, and legitimate business purposes (such as billing)."

Defendant does not dispute the outcomes in *Johnson* and *Delp* or the reasoning underlying those decisions. Nor does he direct us to any "source of law establish[ing] that [he] has some interest in keeping private the information maintained by a third party respecting his [power] usage." Instead, defendant attempts to distinguish the power usage records here from the records in *Johnson* and *Delp*. Defendant contends that, unlike the "noncontent" records at issue in those cases, "utility records disclose details about a person's home—his or her sanctuary protected by constitutional privacy guarantees." He argues that

> "[u]tility usage may disclose when a person has houseguests, when an apartment is occupied by a number of tenants in excess of the provisions of the lease, when someone grows exotic orchids, when someone has an excessive number of electronics and refuses to make power-saving efforts, or—even—when someone is growing marijuana. Those details are not otherwise knowable without a physical intrusion into the protected area of the home."

We disagree with the assertion that the records here are somehow more revealing than the records at issue in *Johnson* and *Delp*. To the contrary, the information from EWEB indicated little more than the addresses of the Beech Place and East 32nd residences and how much electricity each home used per month for the two years preceding the subpoena. The utility records arguably reveal less information about defendant's conduct than the cell phone and Internet usage records at issue in *Johnson* and *Delp*,

respectively, presumably did. We thus conclude that defendant had no constitutionally cognizable privacy right in the EWEB records or the information contained in them and that, therefore, the state did not need to get a warrant to obtain those records.

We turn next to defendant's argument that the trial court erred in denying his motion to suppress because the state obtained the subpoena unlawfully. According to defendant, the assistant district attorney who issued the subpoena did so without having been directed to by the grand jury. Defendant argues that a prosecutor has no authority under ORS 136.563 to issue a subpoena without such direction.[4] Thus, contends defendant, the subpoena is not authorized. Defendant cites *State ex rel Frohnmayer v. Sams*, 293 Or 385, 388, 648 P2d 364 (1982), in which the Supreme Court discussed ORS 136.563, and *State v. Burleson*, 342 Or 697, 705, 160 P3d 624 (2007) (stating that "the grand jury, not the prosecutor, is the actor that drives the investigative process of the grand jury").

The state counters that ORS 136.563 authorized the subpoena and, in any case, under ORS 136.432, any violation of ORS 136.563 would not authorize the exclusion of the EWEB records. We agree with the state's alternative argument and, therefore, do not reach the argument regarding the prosecutor's authority to unilaterally issue a subpoena.

Under ORS 136.432,

"[a] court may not exclude relevant and otherwise admissible evidence in a criminal action on the grounds that it was obtained in violation of any statutory provision unless exclusion of the evidence is required by:

"(1) The United States Constitution or the Oregon Constitution;

"(2) The rules of evidence governing privileges and the admission of hearsay; or

"(3) The rights of the press."

---

[4] Pursuant to ORS 136.563,

"[t]he district attorney may issue subpoenas subscribed by the district attorney for witnesses within the state in support of the prosecution or for such other witnesses as the grand jury directs to appear before the grand jury upon an investigation pending before it."

Defendant does not contend that the power usage records are not relevant or that they are not "otherwise admissible." Instead, defendant relies on his argument that the state violated his constitutional right to privacy in obtaining those records. We have already discussed and rejected that argument.

Defendant also argues that ORS 136.432 does not apply because the prosecutor did not "violate" ORS 136.563 in issuing the subpoena; the prosecutor merely "act[ed] in the absence of any authority." We disagree. The assistant district attorney who issued the subpoena expressly testified that ORS 136.563 authorized him to issue the subpoena in the manner in which he did. And defendant's own argument, including his discussion of *Sams* regarding the primacy of the grand jury over the prosecutor with regard to the subpoena power, is rooted firmly and exclusively in statutory law. Accordingly, we reject the semantic distinction that defendant seeks to draw. Assuming, without deciding, that the prosecutor violated ORS 136.563, we conclude that the trial court nevertheless properly denied defendant's motion to suppress the power usage records under ORS 136.432.

We briefly address defendant's remaining arguments regarding the sufficiency of the affidavit in support of the warrants to search the residences. First, defendant argues that, even with the power usage information, the facts in the affidavit do not establish probable cause. Under ORS 133.555(2), before issuing a warrant, a judge must find that "there is probable cause to believe that the search will discover things specified in the application." "Probable cause" exists when a reasonable person would believe that it is more likely than not that the things specified in the application will be found. *State v. Lynch*, 119 Or App 97, 100, 849 P2d 556 (1993).

We have held, in the context of challenges to marijuana manufacture and distribution convictions, that probable cause existed when "the affidavit stated * * * that electrical usage at the house had increased substantially since defendant had moved in, and that a police officer familiar with how marijuana is grown indoors had smelled marijuana while standing near the house." *Lynch*, 119 Or App

at 100. We similarly held in *State v. Darroch*, 117 Or App 185, 188-89, 843 P2d 978 (1992), that the affidavit there was sufficient to support a finding of probable cause. In *Darroch*, the affidavit stated that the defendant's home had covered windows, the electric power usage for the residence was high relative to its size, and the affiant had not observed any activity on the premises that would explain the consumption of so much electric power. *Id.* The affidavit also included the fact that the affiant had seen a large number of bags of potting soil or fertilizer and several large plastic buckets, both of which were commonly used to grow marijuana, as well as the fact that the defendant had a prior drug possession conviction. *Id.* at 189. With the exception of the plastic buckets, the affidavit in this case contains the same information that we held in *Lynch* and *Darroch* was sufficient to establish probable cause. We thus readily conclude that probable cause supported the warrants to search the residences.

Defendant's additional argument—that the warrants were invalid because the facts in the affidavit were consistent with lawful activity—is not well taken. It is true that we have previously concluded that facts "indicating the presence of an illegal marijuana-growing operation" did not, by themselves, constitute probable cause when the facts "[a]re also consistent with lawful activity." *State v. Christen/Hankins*, 79 Or App 774, 783, 720 P2d 1303 (1986). However, such facts, when combined with other facts *not* consistent with lawful activity (*e.g.*, in *Christen/Hankins*, an informant's tip that illegal drug manufacturing was taking place at a specific location), can establish probable cause. *Id.* Here, there is evidence inconsistent with lawful activity, including Lowe's observation of "the overwhelming odor of fresh marijuana" emanating from the East 32nd residence, which was not a registered grow site. There was a sufficient basis from which the magistrate could find probable cause to believe that there was evidence of defendant's criminal activity on the premises searched.

In his last argument pertaining to the trial court's denial of his motion to suppress, defendant argues that his consent to search the Ferry Street residence was not "voluntary" because it was derived from the state's prior unlawful conduct. Given our rejection, above, of defendant's

arguments as to the validity of the subpoena and the search warrants, however, the necessary premise of defendant's consent argument has evaporated. The trial court correctly denied defendant's motion to suppress.

## III.  CHILD-NEGLECT CONVICTIONS

We turn to defendant's two assignments of error regarding his conviction on two counts of first-degree child neglect. Defendant contends that the trial court erroneously denied his motion for judgment of acquittal and delivered an incorrect and prejudicial jury instruction regarding an element of the offense. The indictment, which tracked the statutory language of ORS 163.547(1)(a)(B), alleged that

> "defendant, on or about February 9, 2011, in Lane County, Oregon, having custody or control of * * * a child under 16 years of age, did unlawfully and knowingly allow the child to stay in and upon premises and in the immediate proximity where controlled substances were being criminally manufactured for consideration and profit[.]"

Defendant argues that the state failed to present sufficient evidence that he had "control" of Kimm's children or that he allowed them to stay in the "immediate proximity" of the criminal manufacturing of controlled substances. Defendant also argues that the trial court's jury instruction regarding "control" misstated the law and permitted the jury to reach an erroneous result.

### A.  *Instructional error*

We begin by examining the court's jury instruction. We review for legal error. *State v. Barnes*, 329 Or 327, 333, 986 P2d 1160 (1999). A trial court commits reversible error when it incorrectly instructs the jury on a material element of a claim or defense and that instructional error permits the jury to reach a legally erroneous result. *Wallach v. Allstate Ins. Co.*, 344 Or 314, 326, 329, 180 P3d 19 (2008).

Over defendant's objection, the court instructed the jury that

> "[a] person has control of a child either by virtue of their relationship to the child or by virtue of the person's ability to control the premises where the child is physically present."

The trial court agreed with the state's argument that our previous decision in *Mack* supported such an instruction. According to the state, in *Mack*, we squarely addressed the issue of whether an individual's control over premises grants that person "control" of children on those premises for purposes of ORS 163.547 and answered that question in the affirmative. In defendant's view, *Mack* and the lone case upon which the court in *Mack* relied, *State v. Reiland*, 153 Or App 601, 958 P2d 900 (1998), are not as decisive as the state argues. We agree with defendant.

In *Reiland*, the defendant was convicted of four counts of first-degree child neglect and four counts of endangering the welfare of a minor, ORS 163.575(1)(b),[5] after the police found marijuana in her home. 153 Or App at 603. The marijuana belonged to the defendant's spouse. *Id*. On appeal, the defendant argued that her conviction on the child-neglect counts should have merged with her conviction on the child-endangerment counts because each of those statutes did not require proof of an element that the other did not. *Id*. at 603-04 (citing *former* ORS 161.062(1) (1997), *repealed by* Or Laws, 1999, ch 136, § 1.[6] The state argued that the convictions should not merge because "there exists a significant difference between the child-neglect element of 'allowing' a child 'to stay' on 'premises' and * * * the endangering element of 'permitting' a child to 'enter or remain in a place.'" *Id*. at 604 (omission in original). We agreed with the defendant and reversed and remanded for entry of judgment merging the convictions. *Id*. at 605.

We note that both the law and the facts at issue in *Reiland* are distinct from those at issue here. The defendant in *Reiland* was the mother of the children involved and lived with them in the home; it was undisputed that she had "custody" of those children. Thus, *Reiland* did not reach

___

[5] Under ORS 163.575(1)(b), a person commits the crime of endangering the welfare of a minor if the person knowingly "[p]ermits a person under 18 years of age to enter or remain in a place where unlawful activity involving controlled substances is maintained or conducted[.]"

[6] *Former* ORS 161.062(1), provided, in part, "When the same conduct or criminal episode violates two or more statutory provisions and each provision requires proof of an element that the others do not, there are as many separately punishable offenses as there are separate statutory violations." *Reiland*, 153 Or App at 604.

the question presented in this appeal—whether a *non*parent who indisputably does *not* have custody of a child has "control" of that child—and, indeed, involved a different element of child neglect than is at issue here. The relevant legal inquiry in *Reiland* involved whether the word "permit" in the child-endangerment statute denotes the same thing as the word "allow" does in the child-neglect statute. A defendant's conduct in "allow[ing]" a child to stay on certain premises is *a different element* of the crime of child neglect than "having custody or control of a child." *Mack*, 219 Or App at 124.

Reasoning that "'allow' and 'permit' are synonyms" and that "to 'permit' something, one must have authority to forbid it[,]" we concluded in *Reiland* that "[t]he owner of the place where drugs are being sold or used has *authority* over the child by virtue of the person's ownership of the place, just as others have *authority* over the child by virtue of their positions as parent, guardian, teacher, or public official." 153 Or App at 604-05 (emphasis added; internal quotation marks omitted). Relatedly, we stated that "a person with custody or control of a child certainly does have the authority to prohibit the child from remaining in a place, notwithstanding the fact that the person has no authority over the place." *Id.* at 605. However, it is important to note what we did *not* state in *Reiland*: we did not state that ownership of premises gives a person "control" of a child as that term is used with regard to the first element of ORS 163.547, "having custody or control of a child."

In *Mack*, we addressed whether the defendant had "control," as required by ORS 163.547(1)(a)(B), of his girlfriend's child, who lived with him and his girlfriend in a residence that belonged to the girlfriend. The defendant in *Mack* was found guilty of, among other offenses, first-degree child neglect after police discovered evidence of illegal marijuana distribution in the residence. 219 Or App at 121-22. The defendant had his own room that he kept locked and generally prohibited the girlfriend from entering. *Id.* Evidence of the defendant's illegal drug activity was found primarily in his room, but also in the garage and kitchen. *Id.* at 122-23. The indictment alleged that the defendant allowed the child to stay in the residence, but the record established that

the "defendant had no authority to exclude [the child] from being present at [the girlfriend's] residence." *Id.* at 128.

On appeal, the defendant argued that there was insufficient evidence that he had "control" of the child. The state countered that he possessed the requisite control of the child by virtue of his control of the premises. We reversed his child-neglect conviction. We rejected *Reiland* as controlling precedent because, despite the defendant's control over his room in the residence, the "defendant was neither [the child's] custodian, nor did he have the authority to exclude [the child] from [the girlfriend's] residence." *Id.* However, we went on to make the following observation, upon which the state and the trial court in this case relied, concerning whether the evidence established that the defendant could control the child's whereabouts:

> "That conclusion leads to another observation. As stated above, the only contested issue based on the allegations in the indictment and the stipulated facts was whether defendant could *control* the whereabouts of [the child] while the drug activities occurred on the premises. If defendant were vested with control over the premises, then it would follow that he had the authority to allow or not allow [the child] to be on the premises. But if he did not have authority to control [the child]'s person and had no ability to control [the child]'s presence on the premises, then he cannot be said to have had control of [the child] for purposes of the statute. In other words, the first and second elements of the offense, in light of the stipulated facts in this case, become conflated into one element for purposes of determining whether the state proved the allegations of first-degree child neglect. Because there is no evidence in the stipulated facts or an available inference from the stipulated facts that would permit a rational factfinder to find beyond a reasonable doubt that defendant exercised control over [the child]'s person or had the authority to exclude [the child] from the [girlfriend's] residence, it follows that the trial court erred when it convicted defendant of first-degree child neglect."

*Id.* at 129 (emphasis in original; footnote omitted). In short, we relied on *Reiland* for the suggestion in *Mack* that, if the defendant could have controlled the whereabouts of the child—that is, the child's exclusion from the premises— through control over the premises, that fact would have

permitted the conclusion that the defendant had control of the child for purposes of the child-neglect statute. We did not undertake an analysis of that statute's text, context, or legislative history. We do so now. *See State v. Gaines*, 346 Or 160, 164, 206 P3d 1042 (2009) (when interpreting a statute, "[f]irst, the court examines the text and context of the statute").

The child-neglect statute applies only to "person[s] having custody or control of a child under 16 years of age" who engage in certain prohibited conduct. ORS 163.547(1)(a). There is no dispute that defendant here did not have custody of the children. Defendant argues that the trial court misstated the law when it instructed the jury that "*[a] person has control of a child* either by virtue of their relationship to the child or *by virtue of the person's ability to control the premises where the child is physically present.*" (Emphasis added.)

The legislature has not defined "control" as that term is used in ORS 163.547(1)(a). In assessing the meaning of "control" for purposes of that statute, we must therefore determine the meaning of that word most likely intended by the legislature. *Polacek and Polacek*, 349 Or 278, 284, 243 P3d 1190 (2010). We begin by considering the statutory text and context, which are the best evidence of the legislature's intent. *Gaines*, 346 Or at 171. As to the text, we typically give words of common usage their plain, natural, and ordinary meaning. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993). "A statute's context includes other provisions of the same or other related statutes, the pre-existing statutory framework within which the statute was enacted, and prior opinions of this court interpreting the pertinent statutory wording." *Polacek*, 349 Or at 284. We may also look to legislative history to inform our examination of the statutory context. *State v. Blair*, 348 Or 72, 80, 228 P3d 564 (2010). Regarding legislative history, the Criminal Law Revision Commission's official commentary to the Proposed Oregon Criminal Code, when relevant, is deemed particularly persuasive. *State v. White*, 341 Or 624, 639 n 7, 147 P3d 313 (2006).

With those principles in mind, we begin with the ordinary meaning of "control." The dictionary defines the

noun form of "control"—the form used in the statute—to mean

> "the act or fact of controlling <man's increasing ~ over nature> : power or authority to guide or manage : directing or restraining domination <under parental ~> <the car went out of ~ on a curve>."

*Webster's Third New Int'l Dictionary* 496 (unabridged ed 2002) (boldface in original). "Controlling" is defined, in turn, by reference to the verb form of "control," which means,

> "(1) : to exercise restraining or directing influence over : REGULATE, CURB <~ one's anger> *<controlling* her interest in the enterprise> (2) : to have power over : RULE <a single company ~*s* the industry>."

*Id.* (capitalization, italics, and boldface in original).

As an initial matter, we discern nothing in the plain meaning of "control" that necessarily forecloses the notion that a person who does not have custody of a child may yet, by right of that person's control over some premises, have "control" over a child. But, acknowledging that, in some factual scenarios, ownership rights and the ability to exclude others from premises may amount to some form of control of children on those premises is a far cry from the conclusion that an individual's ability to have any type of control over premises imputes to that individual, as a matter of law, "control of a child" on those premises. Nor does it necessarily resolve the question of what the legislature intended "control of a child" to mean.

We turn to an examination of the statutory text in context and the legislative history. The first child-neglect statute, ORS 163.545, was passed as part of the 1971 overhaul of the Oregon Criminal Code, along with other relevant provisions: ORS 163.535, "Abandonment of a child," and ORS 163.555, "Criminal nonsupport." At that time, ORS 163.545(1) provided:

> "*A person having custody or control of a child* under 10 years of age commits the crime of child neglect if, with criminal negligence, he leaves the child unattended in or at any place for such period of time as may be likely to endanger the health or welfare of such child."

(Emphasis added.) "Abandonment of a child" was defined by ORS 163.535(1):

> "A person commits the crime of abandonment of a child if, *being a parent, lawful guardian or other person lawfully charged with the care or custody of a child* under 15 years of age, he deserts the child in any place with intent to abandon it."

(Emphasis added.) "Criminal nonsupport" was defined under ORS 163.555(1):

> "A person commits the crime of criminal nonsupport if, *being the parent, lawful guardian or other person lawfully charged with the support of a child* under 18 years of age, born in or out of wedlock, he refuses or neglects without lawful excuse to provide support such child."

(Emphasis added.)

With the exception of a few minor amendments that are not germane to our discussion, ORS 163.535 and ORS 163.555—abandonment and criminal nonsupport, respectively—have remained unchanged. However, in 1991, the legislature did amend ORS 163.545, the child-neglect statute, to specify that the conduct prohibited by that statute constitutes child neglect *in the second degree*. Or Laws 1991, ch 832, § 2. "The 1991 amendment was necessary because the legislature created a new crime that year—child neglect in the first degree, ORS 163.547—to prohibit persons from allowing children under 16 to be around certain illegal activities involving controlled substances." *State v. Drown*, 245 Or App 447, 463 n 7, 263 P3d 1057 (2011). Thus, although first-degree child neglect described in ORS 163.547 criminalizes different conduct than ORS 163.545, it still applies, as ORS 163.545 did and still does, only to "person[s] having custody or control of a child."

The significance of the foregoing observations lies in the difference between the categories of offenders to which those various criminal statutes concerning the welfare of children apply. As we have highlighted, the offense of child neglect—whether in the first or second degree—applies only to persons "having custody or control of a child," whereas child abandonment and criminal nonsupport apply to

"parent[s], lawful guardian[s][,] or other person[s] lawfully charged with," in the case of abandonment, "the care or custody of a child," or, in the case of criminal nonsupport, "with the support of a child." From that fact, we conclude that the legislature intended "having custody or control" to mean something distinct from "being a parent, lawful guardian[,] or other person lawfully charged with" a specific duty with respect to a child.

The Criminal Law Revision Commission's commentary to the child neglect statute directly addresses and supports that distinction. According to that commentary, the commission

> "intended [ORS 163.545] to complement the sections on child abandonment and criminal nonsupport by providing coverage for situations involving criminal neglect. The crucial issue here is not whether the child was deserted or left without nominal support, but whether it was left unattended under circumstances likely to endanger its health or welfare.
>
> "The term 'custody or control of a child' extends the reach of the section beyond the child's parent or guardian; it includes the temporary custodian, *e.g.*, baby-sitter, relative, teacher."

Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report § 174, 176 (July 1970). Also relevant, the commission stated in the commentary regarding the criminal nonsupport statute that that statute "makes it a crime for a parent or a person *in loco parentis* of a child less than 18 years old to intentionally fail or refuse to provide support for such child." *Id.* at § 175, 177. Thus, as relevant to this dispute, the offense of child neglect is complementary to the offenses of abandonment and criminal nonsupport, yet distinguishable from those statutes on two bases: the conduct prohibited and the category of offenders to which it applies.

As to the latter distinction, it is evident from the commentary quoted above that the drafters intended the category of offenders to which the child-neglect statute applies to be broader than the category to which the abandonment

and nonsupport statutes apply.[7] Furthermore, and most significantly, the commentary clarifies that the particular manner in which the drafters broadened the "reach of [the child-neglect statute] beyond the child's parent or guardian," *i.e.*, the target of the abandonment and nonsupport offenses, was to "include[] the temporary custodian, *e.g.*, baby-sitter, relative, teacher." Based on that part of the commentary, we conclude that the category of "the temporary custodian" represents the only additional group—that is, beyond parents or those in the position of parents, as contemplated in the other statutes—to fall within the child-neglect statute's extended reach. In other words, we do not understand the commentary as providing that temporary custodians are but *one example* among others encompassed by the child-neglect statute's broader scope.

To summarize, certain offenses concerning the welfare of children (*e.g.*, abandonment and nonsupport) apply only to parents or persons *in loco parentis* to children. The child-neglect statute similarly applies to such individuals; it *also* applies, unlike the other statutes, to "temporary custodians," *i.e.*, those who are not "lawfully charged with" the care, custody, or support of a child but who nevertheless have "control" of the child.

Having determined that the legislature intended the phrase "having *** control of a child" as used in ORS 163.547(1)(a) to refer to "temporary custodian[s]," we further conclude that, as defendant argues, the trial court's instruction to the jury that "[a] person has control of a child *** by virtue of the person's ability to control the premises where the child is physically present" misstated the law. We therefore disavow our suggestion in *Mack* that the ability to exclude a child from the premises is equivalent to "control of a child" under ORS 163.547. Depending on the facts of a given situation, it may be that a person with control over certain premises can also be found to be the temporary custodian of a child on those premises. In some circumstances, an individual's status as a child's temporary custodian may even derive

---

[7] In contrast, as the Supreme Court observed in *State v. McBride*, 352 Or 159, 167 n 5, 281 P3d 605 (2012), the offense of "child neglect reaches a more limited group of defendants (those with actual custody or control of a child, such as a parent or guardian)" than does the offense of child endangerment.

inextricably from that individual's control over, and ability to exclude persons from, those premises. However, undoubtedly, in numerous contexts, a person will have some control over premises yet in no way qualify as the temporary custodian of children on those premises. In other words, evidence of some kind of ability to control premises may be relevant to establish, but insufficient by itself to impute as a matter of law, "control of a child" for purposes of ORS 163.547(1)(a).

Because the trial court's instruction is directly at odds with that conclusion, it misstated the law in a way that would have allowed the jury to conclude that defendant had "control" of the children even though he may not have been their temporary custodian. Because we reject defendant's contention that he was entitled to judgments of acquittal, as we explain in our discussion below, and given our construction of the statute, we reverse and remand defendant's convictions for child neglect in the first degree. *See Wallach*, 344 Or at 322 (noting that, pursuant to ORS 19.415(2), "[n]o judgment shall be reversed or modified except for error substantially affecting the rights of a party"); *id.* at 329 ("[W]hen a trial court incorrectly instructs the jury on an element of a claim or defense and when that incorrect instruction permits the jury to reach a legally erroneous result, a party has established that the error substantially affected its rights within the meaning of ORS 19.415(2).").

## B. *Motion for judgment of acquittal*

We turn now to defendant's argument that the trial court erred when it denied his motion for judgment of acquittal on the child-neglect counts. On review of a denial of a motion for judgment of acquittal, we determine whether a reasonable trier of fact, viewing the evidence in the light most favorable to the state, could find that the state proved each element of the charged offense beyond a reasonable doubt. *State v. Cervantes*, 319 Or 121, 125, 873 P2d 316 (1994). Defendant argues that there was insufficient evidence that defendant had "control" of Kimm's children, under a correct understanding of ORS 163.547(1)(a), and that there was insufficient proof that he allowed the children in the "immediate proximity" of the growing operation as required under ORS 163.547(1)(a)(B).

As to the first argument, we conclude that there was sufficient evidence to permit the jury to conclude that defendant had "control" of the children under the proper understanding of that phrase, as set out in our analysis above. Defendant argues that Kimm's testimony that he had "zero control" over the children and "no say in what they do and how they live their lives" forecloses the possibility of finding that he had such control. However, viewing the evidence in the light most favorable to the state, as we must, that testimony by itself is not enough to overcome other evidence presented at trial that would permit a rational factfinder to find beyond a reasonable doubt that defendant had the requisite control. For example, the children had been residing with defendant for four years, since the ages of approximately 7 and 10 years of age. Kimm had also left the children under defendant's care when she traveled out of state and at various other times, including specifically during the month of February 2011. We therefore conclude that the evidence was sufficient to support a finding that defendant had "control" over Kimm's children on or about February 9, 2011, as alleged, and that the trial court did not err in denying defendant's MJOA on the child-neglect counts.

We turn to defendant's second argument. Defendant emphasizes that the state charged him with allowing the children to stay in "the immediate proximity where controlled substances were being criminally *manufactured*." (Emphasis added.) In defendant's view, the "manufacture" of marijuana consists of the growing of marijuana, and "[t]he only evidence was that the marijuana was growing in the garage and was separated from the residence by two locked doors to which the children had no keys." According to defendant, the evidence showed that he excluded the children from the garage, where the marijuana grew, and thus they were never in the immediate proximity of drug manufacturing. Defendant points to the following dictionary definitions of "immediate" and "proximity" as support for his argument:

> "'Immediate' means * * * 'being near at hand : not far apart or distant <hid the money in the ~ neighborhood>,' 'directly touching or concerning a person or thing <the child's *immediate* world is the classroom>* * *.' *Webster's Third New Int'l*

*Dictionary* 1129 (unabridged ed 2002). 'Proximity' means 'the quality or state of being proximate, next, or very near (as in \*\*\* place \*\*\*) \*\*\*: NEARNESS.' \*\*\* '[P]roximate' means 'very near : immediately adjoining : CLOSE \*\*\*.' *Id.* at 1828."

(Italics in original.)

The state counters that, even if defendant's marijuana "operation" was confined to the garage, the evidence was nevertheless sufficient for a rational juror to find that the children were in the immediate proximity of the operation. The state also argues, in the alternative, that defendant's manufacture of marijuana consisted not only of growing plants but also processing them, weighing and packaging them, and distributing them for profit. When understood in that manner, contends the state, the evidence establishes that instrumentalities of defendant's manufacture of marijuana (*e.g.*, bags of marijuana, the digital scale, and boxes) were located in the immediate proximity of the children.

Assuming, without deciding, that defendant's marijuana manufacturing was limited to the garage, we conclude that there was sufficient evidence that the children, by residing in the home, were in the immediate proximity of that manufacturing operation. There are two problems with defendant's argument to the contrary.

First, defendant's assertion that the children did not have access to the garage and the marijuana-growing room in it is not supported by the evidence. That evidence indicated only that "there were locks on the door" to the garage and that, on the evening of the police search, defendant had to unlock the door to the garage to let Lowe in. It does not necessarily follow that the garage was always or even usually locked. It hardly matters, then, that "the children had no keys to the locks to the garage[.]" Second, the very definitions of "immediate" and "proximity" adduced by defendant indicate that actual access is not required for immediate proximity to exist. Those definitions show, instead, that one may be in "immediate proximity" to something if they are "very near" or "not far apart" from that thing. The trial court did not err in denying defendant's motion for judgment of acquittal on the child-neglect counts.

## IV. UNLAWFUL POSSESSION OF LSD

In his remaining six assignments of error, defendant challenges the trial court's denial of his motion for judgment of acquittal on Counts, 6, 7, 8, 9, and 10—unlawful manufacture of hashish, unlawful delivery of hashish, unlawful possession of hashish, unlawful possession of LSD, and unlawful possession of psilocin mushrooms, respectively. We reject defendant's arguments as to all but Count 9 without discussion. As to Count 9, the state concedes that the evidence did not support defendant's conviction for unlawful possession of LSD, ORS 475.840.

The state's concession is well taken: an individual's mere proximity to drugs is not sufficient to prove possession when other individuals are also in proximity to the drugs. *State v. Oare*, 249 Or 597, 599-600, 439 P2d 885 (1968). Here, the police discovered the LSD in the drawer of a dresser in the master bedroom that defendant shared with Kimm. Because the state did not present any other evidence linking defendant to the LSD, we reverse defendant's conviction on Count 9.

Convictions for first-degree child neglect, ORS 163.547, reversed and remanded; conviction for unlawful possession of LSD, ORS 475.840, reversed; remanded for resentencing; otherwise affirmed.