Argued and submitted November 14, 2014, affirmed September 16, 2015

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

CARL LEROY CROSSWHITE, JR.,
*Defendant-Appellant.*

Washington County Circuit Court
D123584M; A154208

359 P3d 529

Lindsey J. Burrows, Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Pamela J. Walsh, Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Ortega, Presiding Judge, and DeVore, Judge, and Garrett, Judge.

ORTEGA, P. J.

## ORTEGA, P. J.

Defendant appeals a judgment of conviction for four counts of second-degree animal neglect, ORS 167.325, raising four assignments of error that challenge the trial court's denial of his motion for judgment of acquittal. (We reject his fifth assignment of error without written discussion.) We conclude that there was sufficient evidence for a reasonable jury to find that defendant had control over the dogs involved in the charges of second-degree animal neglect. Accordingly, we affirm.

When reviewing the denial of a defendant's motion for judgment of acquittal, "[w]e view the evidence in the light most favorable to the state to determine whether a rational trier of fact, making reasonable inferences, could have found the essential elements of the crime proved beyond a reasonable doubt." *State v. Hall*, 327 Or 568, 570, 966 P2d 208 (1998). We state the facts in accordance with that standard.

For about five years, defendant lived, on and off, at the home of a friend, Evans. A third person, Exendine, also lived in the household, and she and Evans together owned 10 pit bulls that lived at the house. Defendant had been acquainted with the dogs since they were acquired, and he frequently interacted with the dogs, feeding them if their bowls were empty and taking them to the veterinarian if Exendine asked him to. The dogs fought a lot and when they did, he broke up the fights himself or helped others do so, sometimes using a water hose. Defendant and the dogs' owners also talked about finding new homes for them. Defendant acknowledged that proper care of the dogs includes not only feeding and giving them water, but also not allowing them to hurt each other.

Police visited the home frequently, and routinely found defendant there no matter what the hour. Two officers testified that defendant had set up residence at the house, and that Evans would have had to formally evict defendant if he had wanted defendant to leave. Evans' father, who owned the house before he passed away, once invited an animal control officer into the house, and defendant told the officer that he was trespassing and had to leave; Evans' father intervened and allowed the officer to stay. The animal

control worker also testified that defendant was normally at the residence when he responded to animal neglect calls. Even at times when he did not live there, defendant went to the house "every day" to work.

Defendant slept at the house the night before the events at issue. The next day, neighbors heard a number of dogs making loud noises—"screaming bloody murder"— at the house. The neighbors saw the dogs fighting and saw people, including defendant, in the yard cheering the dogs on with statements like "get him," "good dog," and "kill him." The neighbors yelled at them to break up the fight. Defendant grabbed a hammer from the house and used it to hit the dogs in order to separate them. Authorities seized the dogs, and later examinations revealed that four of the dogs had abundant scarring and old and new wounds; one dog had "wounds too numerous to count," one of which was oozing. The wounds were consistent with a long-term pattern of dog fighting and dog bites.

Defendant was charged with one count of second-degree animal abuse, ORS 167.315, and four counts of second-degree animal neglect, ORS 167.325. After the presentation of the state's evidence, defendant moved for a judgment of acquittal on all counts, arguing, as to second-degree animal neglect, that the state had failed to present sufficient evidence from which a jury could conclude that defendant had custody or control over the dogs. The court denied the motion and determined that, from the evidence presented, a jury could conclude that defendant had custody and control over the dogs because he resided in the home. The court emphasized that defendant's statement that "[w]e were going to take some efforts to try to place the dogs or adopt them out" implied an ownership role or that he had some kind of control over the dogs. Defendant was convicted on all counts.

Defendant appeals and assigns error to the trial court's denial of his motion for judgment of acquittal on the second-degree animal neglect counts. ORS 167.325(1) provides, in relevant part:

"A person commits the crime of animal neglect in the second degree if, except as otherwise authorized by law, the

person intentionally, knowingly, recklessly or with criminal negligence:

"(a)   Fails to provide minimum care for an animal in such person's custody or control[.]"

Defendant on appeal reprises his argument that the state failed to prove that he had "custody or control" over the dogs, asserting that a person must have a legal duty to care for an animal in order to face criminal liability for failing to provide minimum care. Defendant contends that the state could not make that showing because he did not own the dogs, but rather cared for them on occasion. The state argues in response that "custody and control" in this context includes a person who cares for an animal or has power or exercises restraint over it, as defendant did.

To determine what the legislature intended by "custody or control" in ORS 167.325(1), we examine the text, context, and legislative history of the statute. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009). The most "persuasive evidence of the intent of the legislature" is the text, as "[o]nly the text of a statute receives the consideration and approval of a majority of the members of the legislature, as required to have the effect of law." *Id.* at 171 (internal quotation marks omitted). When the legislature fails to define a term, courts look to the ordinary meaning of the terms the legislature has used; "words of common usage typically should be given their plain, natural, and ordinary meaning." *PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993).

Here, the statute does not define the phrase "custody or control," but because the terms are stated disjunctively, we need only determine if a reasonable jury could have found that defendant had *either* custody or control over the dogs. Because we conclude that defendant had "control" over the dogs, we affirm the trial court's denial of defendant's motion for judgment of acquittal.

Control is defined as "the act or fact of controlling : power of authority to guide or manage : directing or restraining domination." *Webster's Third New Int'l Dictionary* 496 (unabridged ed 2002). In common usage, then, a person "controls" an animal when he or she exercises power over

it, directs it, manages it, or restrains it. The term "control" does not include any reference to ownership or legal authority over an animal.

We next examine the context of the statute, starting with statutes related to ORS 167.325. *See Force v. Dept. of Rev.*, 350 Or 179, 188, 252 P3d 306 (2011) ("'[C]ontext' includes, among other things, other parts of the statute at issue."); *Morsman v. City of Madras*, 203 Or App 546, 561, 126 P3d 6, *rev den*, 340 Or 483 (2006) (The "same statute" can refer to the same chapter in which a provision has been codified.). ORS 167.374(2) and (3) and ORS 167.376(2), which establish standards for breeding dogs, refer to persons who "possess, control or otherwise have charge of an animal," recognizing different kinds of power over animals.

The overall statutory scheme—a series of animal protection statutes—prohibits conduct such as causing serious physical injury to an animal, ORS 167.320; cruelly killing an animal, ORS 167.320; torturing animals, ORS 167.322; sexually assaulting animals, ORS 167.333; abandoning animals, ORS 167.340; and engaging in dog fighting, ORS 167.360 - 167.375. *See State v. Ofodrinwa*, 353 Or 507, 512, 300 P3d 154 (2013) ("The context for interpreting a statute's text includes * * * the statutory framework within which the law was enacted." (Internal quotation marks omitted.)); *State v. Klein*, 352 Or 302, 309, 283 P3d 350 (2012) (a statute's context includes "related statutes"). The series of animal protection statutes reveals an overall legislative purpose to shield animals from a wide variety of harms, apart from the issue of ownership.

Because we have not yet interpreted the meaning of "custody or control" in ORS 163.325, we examine the legislature's use of those terms in similar statutes, particularly those concerning child neglect. Whenever possible, we construe statutes to be consistent with one another. ORS 174.010.

We addressed the term "control" in second-degree child neglect in *State v. Sparks*, 267 Or App 181, 203, 340 P3d 688 (2014), and concluded that, in that context, a "temporary custodian" such as a "babysitter, relative, [or] teacher," is an example of a person who may have "control" over a

child. 267 Or App at 203. We further determined that, for purposes of child neglect, "evidence of some kind of ability to control premises" where a child is physically present "may be relevant to establish, but insufficient by itself to impute as a matter of law, 'control of a child.'" *Id.* at 204. In *Sparks*, defendant's girlfriend's children lived with him, and he provided care for them in various ways. For example, defendant

> "'sometimes' picked up the children after school and dropped them off places, 'occasionally *** baby-s[a]t' them, and took care of them when [his girlfriend] worked out of the home ***, and 'cared for [the] children once for [a] couple days' when [the girlfriend] traveled to Hawaii[.]"

*Id.* at 187. The court concluded that, based on that evidence, there was a sufficient basis to permit the jury to find that the defendant had "control" of his girlfriend's children for purposes of second-degree child neglect. *Id.* at 205.

The plain text and context of ORS 167.325(1), together with the legislature's use of the same term in a similar statute, demonstrate that the legislature intended the term "control" to include someone who has authority to guide or manage an animal or who directs or restrains the animal. Here, similar to the defendant in *Sparks*, the evidence showed that defendant had control of the dogs, because he effectively lived in the home and cared for and maintained the dogs, fed them, and took them for veterinary visits. He also was part of decision-making about whether the dogs should continue to live in the home, and exercised power over and restrained the dogs—particularly by breaking up dog fights, both previously with a water hose and, on the day at issue, with a hammer. Accordingly, we conclude, based on that evidence, that a reasonable juror could find that defendant had control over the dogs, and the trial court did not err in denying his motion for judgment of acquittal.

Affirmed.